**BOARD OF REGENTS OF the UNIVERSITY OF TEXAS et al., Appellants,**

v.

**Donald B. YARBROUGH et al., Appellees.**

**No. 5028.**

Court of Civil Appeals of Texas, Waco.

Aug. 5, 1971.

Rehearing Denied Aug. 26, 1971.

Small, Herring, Craig & Werkenthin, C. C. Small, Z. T. Fortescue, III, Asst. Atty. Gen., Austin, for appellants.

Stayton, Maloney, Black, Hearne & Babb, Sloan, Muller & Godfrey, Austin, for appellees.

## OPINION

JAMES, Justice.

This case grew out of the consolidation of two suits. In the first suit the Board of Regents of the University of Texas (hereinafter called "the University") brought a declaratory judgment action against Donald B. Yarbrough for the purpose of determining the validity and relative superiority of deeds held by each of them to Dr. Caleb Perry Patterson's home place located in Austin, Texas.

In the second suit, Malcolm Patterson as guardian of the person and estate of Dr. Caleb Perry Patterson (hereinafter called "the Guardian") sued the Board of Regents of the University of Texas and the State of Texas to set aside the deed under which the University claimed as well as to set aside the Bill of Sale and the Trust Indenture and Agreement, all more particularly hereinafter described, all of which were executed by Dr. Patterson on January 8, 1966.

The two suits were consolidated, and the Guardian enlarged his pleadings to set aside the Yarbrough deed also.

The Yarbrough deed bore the date of August 4, 1965, and was executed by "Caleb Perry Patterson, Individually and as Independent Executor of the Estate of Tommie A. Patterson, deceased", the said Tommie A. Patterson being the deceased wife of Dr. Patterson. This deed recited a consideration of $35,000.00 cash paid by Yarbrough, and conveyed to Yarbrough Dr. Patterson's home place in Austin, with the reservation of a life estate in Dr. Patterson.

The University deed is denominated on its face a "Deed of Gift," bears the date of January 8, 1966, is executed by Dr. Patterson Individually and as Independent Executor of his deceased wife's estate, conveys the Dr. Patterson home place to the Board of Regents of the University as Trustee, and in which Dr. Patterson

reserved a life estate. The deed also contains recitations to the effect that it is the purpose of this gift to provide a fund to establish and support a Perry Patterson Professorship of Government at the University in Dr. Patterson's honor. In the granting clause, the deed uses the words "give, grant and convey".

The Bill of Sale to the University is dated January 8, 1966, is executed by Dr. Patterson in the same capacities as the two deeds above-referred to, and gives to the University the furniture, furnishings, libraries and other personal property in his home place, with the life estate reservation in favor of Dr. Patterson.

The "Trust Indenture and Agreement" was dated January 8, 1966, was executed by Dr. Patterson in the same capacities as the three instruments above-referred to, set up a trust with the Board of Regents of the University as Trustee, and conveyed to the Trustee title to certain stocks and savings accounts for the expressed purpose of setting up fellowships in political science at the University in the name and honor of Dr. Patterson and his deceased wife. It was provided that the income of the trust property would go to Dr. Patterson during his lifetime, and after his death to the University for the aforesaid purposes.

The jury found in answer to the following numbered special issues as follows:

(1) That Dr. Patterson did sign the Yarbrough deed;

(2) That Yarbrough paid the $35,000.00 to Dr. Patterson which was recited to have been paid as consideration for the Yarbrough deed;

(3) That Dr. Patterson signed the Yarbrough deed at a time subsequent to January 8, 1966. (In this connection, the supplemental statement of facts shows that about 24 hours after the jury was discharged, it came to the court's attention that the jurors had been mistaken as to the meaning of the word "subsequent"

used in Special Issue No. 3, whereupon the Court reassembled the jury and attorneys; that in this hearing the court confirmed that the jurors had been under the erroneous impression that the word "subsequent" meant "before" instead of "after". Learning this, the court charged the jury that the word "subsequent" means "after" and thereupon polled the jury, in response to which each juror changed his answer, and thereafter the jury's answer to Special Issue No. 3 was changed on the court's charge to the effect that Dr. Patterson did *not* sign the Yarbrough deed *after* January 8, 1966. We express no opinion as to the validity of this procedure, but point it out as shedding light on the jury's findings on the other special issues.)

(4) That the University took the deed of January 8, 1966 from Dr. Patterson without notice of the Yarbrough deed bearing date of August 4, 1965.

(5) That Dr. Patterson did have mental capacity at the time he signed the Yarbrough deed.

(6) That Dr. Patterson did not have mental capacity at the time he executed the instruments of January 8, 1966, under which the University claims.

(7) That Dr. Patterson executed the instruments dated January 8, 1966 to the University as the result of undue influence of employees of the University.

Pursuant to and in accordance with the jury verdict, the trial court entered judgment which:

(1) cancelled, set aside, and held for naught the Deed of Gift, the Bill of Sale, and the Trust Indenture that Dr. Patterson had made to the University on January 8, 1966;

(2) adjudged that the University take nothing against the Guardian or Yarbrough;

(3) declared the Yarbrough deed to be valid and in full force and effect, and vested title of the Dr. Patterson home place in Yarbrough subject to the life estate in favor of Dr. Patterson;

(4) vested all the property described in the Bill of Sale and Trust Indenture into the Guardian, and ordered the University to deliver all of this property over to the Guardian except the sum of $11,821.10 which was actually disbursed by the University for the benefit of Dr. Patterson, his deceased wife, or their estates;

(5) granted writs of possession to Yarbrough and the Guardian in connection with the respective properties awarded to them; and

(6) taxed the costs against the University.

The University as appellant limits its attack on the trial court's judgment insofar as only the jury's answers to Special Issues Nos. 6 and 7 are concerned, and levels five points of error, the substance of each being as follows:

(1) That there is no evidence to support the jury's finding to Special Issue No. 6, wherein the jury found that Dr. Patterson did not have mental capacity at the time he executed the Deed, Bill of Sale and Trust Indenture of January 8, 1966 to the University.

(2) That the jury's answer to Special Issue No. 6 is contrary to the great weight and preponderance of the evidence.

(3) That there is no evidence to support the jury's answer to Special Issue No. 7, wherein the jury found that Dr. Patterson executed the Deed, Bill of Sale and Trust Indenture to the University on January 8, 1966 as the result of undue influence of employees of the University.

(4) That the jury's answer to Special Issue No. 7 is contrary to the great

weight and preponderance of the evidence.

(5) That the jury's answers to No. 6 (lack of mental capacity) and to No. 7 (undue influence) are conflicting and destructive of each other, and therefore cannot support the judgment.

We have carefully considered the entire record consisting of 1501 pages of the original and supplemental statement of facts and including 136 exhibits.

Dr. Patterson commenced teaching government at the University about 1920; he became Chairman of the Government Department and continued as a member of this Department until his retirement in the late 1950's. He and his wife, Tommie A. Patterson, had no children, and she died in May of 1965. In and about the year 1934, the Pattersons acquired the home place in Austin, Texas, which is the subject matter of the deed to Yarbrough and the deed to the University, hereinabove described.

After Mrs. Patterson's death, Dr. Patterson continued to live in the home place at all times material to this suit, and was adjudged of unsound mind in March of 1969. His nephew, Malcolm Patterson, a resident of Wyoming, qualified as the guardian of his person and estate.

We will take up appellant's points one at a time in the order set out in appellant's brief, beginning with the first point, that is, to the effect that there is no evidence to support the jury's finding to Special Issue No. 6, wherein the jury found that Dr. Patterson did not have mental capacity at the time he executed the Deed, Bill of Sale, and Trust Indenture to the University on January 8, 1966.

The trial court correctly defined "mental capacity" as the person executing the instruments having sufficient mind and memory to understand the nature and effect of the act in which he is engaged and the business which he is transacting.

"No evidence" points must, and may only be sustained when the record discloses one of the following situations:

(a) a complete absence of evidence of a vital fact;

(b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact;

(c) the evidence offered to prove a vital fact is no more than a mere scintilla; or

(d) the evidence establishes conclusively the opposite of the vital fact. Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.R. at 363.

We believe the record as a whole shows evidence of probative value to the effect that Dr. Patterson did not have mental capacity at the time he executed the Deed, Bill of Sale and Trust Indenture to the University on January 8, 1966; in fact, we believe there is substantial evidence to this effect.

In October 1964, Dr. Patterson suffered a fall at his home in Austin. Dr. Virgil B. Lawlis, an internal medicine specialist, was called to the Patterson home to treat him. At that time, Dr. Patterson was unable to lift himself into bed and was soiled with feces and urine from involuntary bowel and bladder functioning. Dr. Lawlis testified that at the time Dr. Patterson could not talk well. Dr. Lawlis recommended hospitalization which Dr. Patterson refused until the next day. When Dr. Patterson went into the hospital, he could not remember his prior night's difficulty. Dr. Patterson remained in the hospital for about one week; that for the first three days he had fever as high as 101 degrees and was "mixed up and confused" according to Dr. Lawlis as to time and place, and in Dr. Lawlis' opinion Dr. Patterson during this time would not have known the nature and consequences of his acts.

Dr. Patterson was at this time 84 years of age, and Dr. Lawlis said that elderly

people normally get delirious and confused at a lower fever range than do younger people.

About two months after the October 1964 hospitalization, Dr. Lawlis saw Dr. Patterson when he had again fallen and suffered a compression fracture of the vertebrae for which Dr. Lawlis recommended X-rays. Dr. Patterson refused to have them made. Dr. Lawlis further testified that in August 1968 that Dr. Patterson was completely incompetent, a fact that anyone could tell just by conversation with him. Dr. Lawlis could not determine mental competence prior to August 1968 because he did not see Dr. Patterson regularly.

Dr. Tracy Gordy, a psychiatrist who treats geriatric patients, had never personally examined Dr. Patterson; but in response to hypothetical questions along the lines of Dr. Patterson's fact situation and his age and condition, testified that in his opinion Dr. Patterson did not have sufficient mind and memory to understand the nature and consequences of his acts when he signed the instruments to the University in January 1966.

Hudson Reed testified that he was employed to come to Dr. Patterson's home beginning in November or December of 1965 for the purpose of bathing and shaving Dr. Patterson and cutting his hair; that he worked in this capacity for about three years; that he usually came to the home about every other day; that he would often be there two or three hours; that Dr. Patterson "talked kind of funny" at times; for example, Reed would tell him he (Reed) had been on a fishing trip and Dr. Patterson would want to know if he had had any luck, and Reed would tell him; and in a few minutes Dr. Patterson would ask Reed how the fishing was, he having forgotten all about their previous conversation; that Dr. Patterson would go to the mailbox and get his mail, and then his housekeeper, Mrs. Smith would come in and he would ask her if the mail had come; that Dr. Patterson sometimes imagined there were people in the house that were

taking about him and he wanted them to leave, when there was actually nobody there; that he would tell Reed that he wanted to go home because he was "getting tired of this place", when he was already home; that Dr. Patterson would "pretty often" soil his clothing and need a bath, but would tell Reed he didn't need a bath, he not realizing how he had soiled his clothing (by urine and feces); that this type of behavior took place all during the time Reed worked for Dr. Patterson, that is, from November or December 1965 for about three years. Mr. Reed testified that he did not believe Dr. Patterson was able to know and fully realize what he was doing.

Rector Allen, a next door neighbor and a witness called by the University, testified that shortly after Mrs. Patterson's death in March 1965, he was sitting on Dr. Patterson's front porch with him, and Dr. Patterson thought he was in San Antonio, and he asked Mr. Allen what the name of the street was that ran in front of his house where he had lived for over thirty years.

Mrs. Sadie Smith had been Dr. Patterson's housekeeper for nearly five years beginning shortly after Mrs. Patterson's death in 1965. Her testimony recalled instances of mental disorientation on the part of Dr. Patterson along the same lines as testified to by Hudson Reed.

We feel that testimony from witnesses such as Hudson Reed and Sadie Smith concerning Dr. Patterson's mental capacity is entitled to considerable weight, in the light of their constant and close personal association with him in his home during times critical to this suit.

Dr. Emmett S. Redford testified that he was the intermediary between Dr. Patterson and the University; that Dr. Patterson wanted to give everything but his checking account to the University; that Dr. Redford tried to persuade Dr. Patterson to retain at least $10,000.00 additional but Dr. Patterson refused to do so; that Dr. Redford personally insisted that the Uni-

versity have Dr. Patterson retain an additional $10,000.00 above his checking account.

Finally, the physical fact that Dr. Patterson sold his home to one party and then within a short time before or afterwards gave this same home to another party is in and of itself some evidence of mental incapacity.

Our disposition of appellant's First Point also disposes of his Second Point, that is, his assertion that the jury's answer to Special Issue No. 6 was against the great weight and preponderance of the evidence.

■ The Supreme Court has enunciated the rule to be followed in In re King's Estate (1951), 150 Tex. 662, 244 S.W.2d 660 at p. 661, to the effect that the Court of Civil Appeals must consider all of the evidence presented at the time of trial and set aside the verdict and remand for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, and this regardless of whether the record contains some evidence of probative force in support of the verdict.

Appellant's first and second points are accordingly overruled.

■ We now take up appellant's third point, to the effect that there was no evidence to support the jury's answer to Special Issue No. 7, wherein the jury found that Dr. Patterson executed the three instruments to the University as a result of undue influence of employees of the University. Here again we think there is evidence of probative value to support the jury's finding to this issue, and that this evidence is substantial.

■ "Undue influence" was correctly defined by the trial court as meaning that there was such dominion and control exercised over the mind of the person executing such instruments, under the facts and circumstances then existing, as to overcome his free agency and free will, and to sub-stitute the will of another so as to cause him to do what he would not otherwise have done but for such dominion and control.

Mrs. Sadie Smith is the principal witness giving direct testimony concerning undue influence, and her testimony is corroborated by other witnesses and by the physical facts. She went to work for Dr. Patterson in May 1965 as his housekeeper and shortly after this time people from the University began coming to the home to see Dr. Patterson, individually and in groups numbering from two to so many as thirty on at least one occasion. According to her testimony these meetings were not always cordial; at times Dr. Patterson would be arguing with these visitors, and their voices would get loud; that after the visitors left Dr. Patterson would get nervous, shaky, upset and confused; that he cried on some occasions; that on one occasion he told her that the Univeristy was going to take all of his money and that he would die a pauper; that he did not want to give it to them but he had to; that she would have to work with him after these visits to settle him down. There were times when Dr. Patterson cursed these visitors from the University to Mrs. Smith after they had left. This type of procedure or routine persisted, according to Mrs. Smith, until "all of the papers were signed" by Dr. Patterson to the University.

In 1965 Dr. Patterson had made it known to the University that he desired to leave his home to the University to be used as a residence for the President or Chancellor since his wife had expressed this desire; but through conversations and conferences with representatives of the University, Dr. Patterson was advised that the Board of Regents would not accept his home for this purpose, as it was not adequate; that he became unhappy and perhaps angry over this; that through several further conferences and remonstrances by professors and officials of the University he was prevailed upon to deed his home and give most of the balance of his worldly possessions to the

University to set up professorships as evidenced by the Deed of Gift, Bill of Sale, and Trust Indenture above referred to. Dr. Patterson's displeasure was corroborated by a number of the University's witnesses.

According to some of the University's witnesses, on at least one occasion Mr. W. W. Stewart, the University Endowment Officer found it necessary to take Mrs. Sadie Smith outside while Dr. Emmett Redford, a professor of Government, discussed the gifts alone with Dr. Patterson.

We have no doubt as to the good faith of the officials and the fellow professors of the University in making these repeated visits individually and in groups to Dr. Patterson's home between the time of his wife's death in the spring of 1965 and the time he executed the instruments to the University on January 8, 1966; their motives were unselfish and were prompted by a desire to benefit the University. But in their zeal they failed to take into account that here was an old man in his dotage, with serious health problems both physical and mental in nature, with no wife, no children, and no relatives who cared anything about him; that by their assiduous efforts they persuaded him to give away all of his earthly possessions worth over $200,000 with the exception of a checking account and a $10,000 savings account. Not only this, but they persuaded him to give his home away in a manner contrary to the expressed desires of himself and his deceased wife. We think the jury's finding of undue influence is correct and amply supported by the record as a whole.

Appellant's fifth point is to the effect that the jury's answers on mental capacity and undue influence are conflicting and destructive of each other, and therefore cannot support the judgment. This point is without merit, as it has been previously held that there is no conflict between a finding of undue influence and a finding of mental incapacity. Gunlock v. Greenwade (Waco, Tex.Civ.App., 1955), 280 S.W.2d 610, writ ref. n. r. e.; DeBorde v. Bryan (Dallas, Tex.Civ.App., 1952), 253 S.W.2d 63, writ ref. n. r. e.

Finding that all of appellant's points and the contentions thereunder are overruled, the judgment of the trial court is accordingly affirmed.

Affirmed.