Debra Renae DECKER, Individually
and as Sole Heir and/or Beneficiary
under Last Will and Testament of
Jimmy Ray Decker, Deceased, and/or
Executor of the Estate of Jimmy Ray
Decker, Deceased, Appellant,

v.

Leroy DECKER, Sr., Appellee.

and

Leroy Decker, Sr., Appellant

v.

Debra Renae Decker, Individually and
as Sole Heir and/or Beneficiary under
Last Will and Testament of Jimmy
Ray Decker, Deceased and/or Execu-
tor of the Estate of Jimmy Ray Deck-
er, Deceased, and Curtis Cooper, Ap-
pellees.

No. 2–05–108–CV.

Court of Appeals of Texas,
Fort Worth.

April 13, 2006.

Gibson, Hotchkiss, Roach & Davenport, Matthew D. Anderson, Wichita Falls, for Appellant/Cross Appellee.

Spencer K. Crouch, Wichita Falls, for Appellee/Cross Appellant.

Panel B: LIVINGSTON, GARDNER, and WALKER, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### I.  Introduction

Debra Renae Decker, individually and as sole heir and/or beneficiary under the

last will and testament of Jimmy Ray Decker, deceased, and/or executor of the estate of Jimmy Ray Decker, deceased ("Debra"), and Leroy Decker, Sr. ("Leroy") appeal from the judgment which awarded Leroy three tracts of real property and which failed to award the motor home. We affirm in part and affirm as modified in part.

## II. Background Facts

This is an appeal from a suit to set aside certain transfers of real property and a motor home from Leroy to his son, Jimmy Decker ("Jimmy"). On January 12, 1996, Leroy executed a will that left his entire estate to his wife, Anna L. Decker ("Anna"), if she survived him by thirty days. If, however, Anna did not survive Leroy by thirty days, Leroy left his entire estate to his three children, Rhonda, Jimmy, and Leroy, Jr. ("Junior").

After Leroy's wife Anna died, Jimmy and Debra, Jimmy's wife, moved in with Leroy, in early 1999, to care for him after he had surgeries to remove a lung and to remove a brain tumor. In January 2000, Leroy executed a second will in which he left all of his property to his son, Jimmy alone, and executed a power of attorney appointing Jimmy as his attorney-in-fact. Additionally, on January 31, 2000, Leroy executed a warranty deed transferring his house and two farm properties to Jimmy.[1] However, Leroy continued to live with Jimmy and Debra in the house after it was transferred to Jimmy. In January 2001, Leroy also transferred title to a motor home to Jimmy.

On June 18, 2002, Jimmy died, and Leroy continued to live with Debra in the house until October 7, 2002, when Debra drew up a notice of eviction informing Leroy that he could no longer live there.

Debra also sold the motor home to Curtis Cooper ("Cooper"), her uncle. On approximately November 7, 2002, Cooper and Charles Tipps ("Charles"), Debra's father, went onto one of the farm properties and removed the motor home.

Leroy then sued Debra seeking to set aside the transfers of real property and the motor home. In regard to the transfers of real property, the jury found that (1) the transfers were not fair, (2) Leroy was unduly influenced, (3) Leroy lacked sufficient mind and memory at the time of the transfers, and (4) Jimmy and Debra did not substantially rely to their detriment on Leroy's promise to convey the house. In regard to the motor home, the jury found that (1) the transfer was fair, (2) Leroy was unduly influenced, (3) Leroy lacked sufficient mind and memory at the time of the transfer, and (4) Cooper was not a good faith purchaser of the motor home. The trial court disregarded the jury's answer in regard to Cooper not being a good faith purchaser because the jury charge instructed the jury that if it found that the transfer of the motor home was fair, then it did not need to answer the question regarding Cooper. On December 22, 2004, the trial court entered a judgment (1) voiding the real property deeds and quieting title in Leroy, (2) awarding Leroy court costs and attorney fees, and (3) disregarding the jury's answer in regard to Cooper as being a good faith purchaser. Additionally, the trial court found that the power of attorney executed by Leroy created a fiduciary duty as a matter of law as to Jimmy. However, the judgment does not mention the disposition of the motor home.

## III. Debra's Issues on Appeal

In her first issue, Debra complains that the trial court erred by finding that the

---

**1.** On January 26, 2000, Leroy executed warranty deeds transferring the property to himself from his revocable trust so that he could transfer the properties to Jimmy.

power of attorney created a fiduciary duty between Jimmy and Leroy as a matter of law. In Debra's second issue, she contends that the trial court erred by refusing to submit the issue of whether a fiduciary duty existed between Jimmy and Leroy and that the trial court improperly commented on the weight of the evidence. In her third issue, Debra states that the evidence presented at trial established as a matter of law that the transfers of real property were unfair. In issues four through eight, Debra complains that the evidence is legally and factually insufficient to establish that (1) the transfers of the real property were fair, (2) the transfers of the real property were the product of undue influence, and (3) Leroy lacked capacity to execute the deeds transferring the real property.

## A. Legal and Factual Sufficiency

We will address Debra's fifth, sixth, seventh, and eighth issues first because they are dispositive. See TEX.R.APP. P. 47.1; *Curtis v. Curtis*, 11 S.W.3d 466, 467 (Tex. App.—Tyler 2000, no pet.). In her fifth and sixth issues, Debra complains that the evidence is legally and factually insufficient to establish that the transfers of real property were the product of undue influence. Additionally, in her seventh and eighth issues, she contends that the evidence is legally and factually insufficient to establish that Leroy lacked capacity when he executed the deeds to the real property.

## B. Standard of Review

A legal sufficiency challenge may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4)

the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could, and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

## C. Applicable Law

■ For there to be undue influence in the execution of an instrument, there must be such dominion and control exercised over the mind of the person executing such instruments, under the facts and circumstances then existing, as to overcome his free agency and free will, and to substitute the will of another so as to cause him to do what he would not otherwise have done but for such dominion and control. *Bailey v. Arlington Bank & Trust Co.*, 693 S.W.2d 787, 789 (Tex.App.—Fort Worth 1985, no writ); *Bd. of Regents of Univ. of*

*Tex. v. Yarbrough*, 470 S.W.2d 86, 92 (Tex. Civ.App.—Waco 1971, writ ref'd n.r.e.).

██ The law presumes that the grantor of a deed has sufficient mental capacity at the time of its execution to understand his legal rights; therefore, the burden of proof rests on those seeking to set aside the deed to show lack of mental capacity of the grantor at the time of the execution of the deed. *Jackson v. Henninger*, 482 S.W.2d 323, 324–25 (Tex.Civ. App.—Austin 1972, no writ). The term "mental capacity" means that the grantor at the time of the execution of the deed must have had sufficient mind and memory to understand the nature and effect of his act. *Id.* at 325. To demonstrate the state of the grantor's mental capacity at the time of the conveyance, evidence of his mental capacity prior and subsequent to the time of the conveyance is admissible. *Id.; see also Haile v. Holtzclaw*, 414 S.W.2d 916, 926 (Tex.1967); *Cole v. Waite*, 151 Tex. 175, 246 S.W.2d 849, 852 (1952). Additionally, the requisite proof regarding mental capacity is within the common knowledge and experience of laypersons and therefore, expert medical testimony is not required. *See Estate of Riggins*, 937 S.W.2d 11, 19 (Tex.App.—Amarillo 1996, writ denied).

### D. Applicable Facts

██ At trial, Brandon Leroy Decker ("Brandon"), Leroy's grandson, testified that Leroy was a "little slow getting around" after he had brain surgery. Brandon testified that after Jimmy and Debra moved into Leroy's house, he saw a "change" in Leroy, and Leroy appeared to be depressed. He stated that Jimmy and Debra treated Leroy good some days and bad other days. Brandon said that Jimmy and Debra would be rude to Leroy sometimes and that they got tired of caring for him. While visiting Leroy, Brandon would hear Jimmy and Debra tell Leroy that they were not going to give John, Leroy's grandson, any more money and that Rhonda and Junior did not care about him because they never came to visit him. Brandon stated that on one occasion, Leroy bought John a Seedoo as a present, and when John came back from college, John found out that Jimmy and Debra had sold it without his knowledge.

Brandon testified that Jimmy or Debra would write out the checks for the bills and have Leroy sign them. He said that Leroy typically did not look over the checks before he signed them. Brandon stated that after Jimmy and Debra moved in, they removed all of Leroy's household furnishings and moved all of their belongings into Leroy's house and that he did not know where Leroy's belongings were.[2]

Additionally, Brandon stated that at the time Jimmy and Debra were living with Leroy, Leroy would go on vacations with Olene, Leroy's girlfriend, and that Leroy would drive the motor home. He further stated that Leroy would feed cows and fix the barbed wire fence at the farm properties during the time of his depression. Additionally, Brandon testified that after Jimmy died, Leroy became more alert, and he was not as depressed. He stated that Leroy gets around on his own, that he lives by himself, and that he can drive himself.

Debra testified that she and Jimmy had financial problems when they moved in with Leroy. She stated that they moved into Leroy's house because Leroy was not properly caring for himself, he was not

---

**2.** Brandon testified that he saw some of Leroy's belongings in a trailer house and at one of Leroy's farm properties.

eating or taking care of his clothes, and he was not keeping the house clean. Debra said that Leroy's health problems included a loss of balance, arthritis, and diminished lung capacity. Additionally, in early 1999, Leroy had surgery to treat brain cancer. She further stated that after she and Jimmy moved in with Leroy, they experienced problems with Leroy interfering with their privacy (i.e., Leroy would answer the telephone). When Jimmy and Debra were living with Leroy, Leroy would occasionally leave them money. Debra testified that Leroy would leave her money on the counter for cleaning the house, and he would give Jimmy approximately $1,000 to $1,200 a month for his help with the farm properties. Additionally, Leroy would sign every bill that was put in front of him to sign.

Debra stated that Leroy told Jimmy and her that they could have the house. Debra said that Charles, her father, gave Jimmy and her $25,000 as a gift from an inheritance that he had received. She further stated that after they accepted the gift of the house and the $25,000, they began remodeling the house and spent approximately $25,000 to $30,000 on the remodeling. Additionally, Jimmy and Debra furnished the house with their own belongings, except Leroy's room, which was furnished with his belongings.

Debra testified that both she and Jimmy gave Leroy his pain medication, but she denied ever giving him medicine that was not prescribed to him by an American doctor.[3] She stated that in late 1999 and early 2000, Leroy could operate a vehicle by himself. She denied preventing Rhonda and Junior from visiting Leroy. Debra admitted that Leroy invested a considerable amount of money in the stock market. However, she testified that she did not make any transactions on or withdrawals from Leroy's Merrill Lynch funds without his knowledge.

In regard to the deed transfers, Debra testified that there was no link between the transfer of the properties and the caring for Leroy. Leroy told her that he was conveying the properties to Jimmy and excluding Rhonda and Junior because he was upset that they did not pay any attention to him. Additionally, Leroy told her that he missed visiting with Rhonda and Junior. She stated that when Leroy went to Jim Ammons's ("Ammons"), his attorney's, office, he was suffering from chronic pain in his back and knees, arthritis, and depression and that he appeared to be in more pain than before. In January 2000, Leroy executed the deeds conveying the two farm properties and the house to Jimmy, a revocation of the previous trust that he and Anna had created, and a directive to physicians. Debra testified that in January 2000, she did not see any indication that Leroy lacked mental capacity.[4] She stated that he did what he wanted to and that he could not be easily influenced by anyone.

Debra testified that on June 18, 2002, Jimmy died of hepatitis C. After Jimmy died, Leroy and she continued to live in the same house; however, Rhonda also moved into the house with them. Debra

---

3. There was some question as to whether Jimmy and Debra gave Leroy pain medicine that they would purchase in Mexico. Debra testified that the pharmacist in Mexico would write out a prescription of the medication they wanted and then fill it. Debra testified that she and Jimmy would go to Mexico to get medicine; however, no medicine was purchased for Leroy.

4. On January 26, 2000, Leroy executed warranty deeds transferring his two farm properties and his house to himself from the Leroy Decker Family Trust. On January 31, 2000, Leroy then executed warranty deeds on the three properties and transferred the properties to Jimmy.

stated that after Rhonda moved in, things began to change, and the house became more "abrasive." Debra stated that after Jimmy died, Leroy, Rhonda, and Junior began removing Jimmy's things from the house without her knowledge, so she prepared an eviction notice for Leroy.[5] In the eviction notice, she told Leroy that she was claiming exclusive possession of the house and was excluding Leroy from it.[6] She gave Leroy a certain date that he had to be out of the house, and he complied with her request to leave. However, Debra admitted that Leroy might have expected to live in the house until his death when he conveyed it to Jimmy. Additionally, Debra did not believe that the two farm properties and the house belonged to Leroy after the conveyances.

Roy Marshall ("Roy"), Leroy's neighbor, testified that in 1980 he moved across the street from Leroy. In 2000, after Jimmy and Debra moved in with Leroy, Roy saw a dramatic change in Leroy's behavior. Roy testified that Leroy was not moving around as well, became lethargic, would sleep more, seemed groggy when he woke up, and appeared to be "doped." Further, Roy stated that in the summer of 2000, on at least five occasions, he would come home and see Leroy on the front porch of his house sleeping and drenched in sweat. Roy said that he would go over, wake up Leroy, and help him inside the house. Additionally, Roy testified that during a conversation with Jimmy, Jimmy told him that Leroy was going to live in the house and give it to Jimmy and Debra when he died. Roy stated that Jimmy told him that he and Debra were going to take care of Leroy.

Leroy testified that he never intended to transfer ownership of his house to Jimmy before his death and that he did not recall signing the deeds conveying the house and farm properties. He stated that in 1996, he had a revocable trust with Anna and a will naming her primary heir and that Jimmy was the executor of that will. In 1999 or 2000, Leroy said that he had approximately $500,000 in the stock market and that even though he had a stock broker, he made the decisions in regard to his stock portfolio. Leroy further testified that during this time, he paid off a house and bought a business for Junior, bought two notes on a land deal for Rhonda, and drove down to the Valley with Olene on several occasions. Leroy further stated that he had a "faint remembrance" of being in Ammons's office.

Charles, Debra's father, testified that he was going to give Jimmy and Debra $30,000 for a down payment for a house. He stated that after looking at two houses seriously, Jimmy and Debra decided to move in with Leroy instead. Charles testified that Leroy told him that he transferred two farm properties and the house to Jimmy because Junior and Rhonda had not come to see him in four years. After Leroy conveyed the house to Jimmy and Debra, Charles testified that he gave the $30,000 to Jimmy and Debra to remodel the house and that he actually paid more than that on the remodeling. However, Charles testified that Leroy indicated that Jimmy, Debra, and Leroy were going to live in the house together. Additionally,

---

**5.** Debra stated that the missing items included the boat insurance and car insurance records, bank statements, and photographs of Jimmy.

**6.** Debra testified that she and Jimmy were actually going to ask Leroy to move out before Jimmy's death because Debra could not care for both Leroy and Jimmy. She testified that she told Leroy that there was a possibility that he was going to have to move out of the house before Jimmy's death.

Charles stated that in 1999 and 2000, he did not see anything that made him think that Leroy did not know what he was doing.

At trial, Ammons testified that during his first consultation with Leroy, Leroy indicated that he was mad at Rhonda and Junior because they did not come visit him and that he wanted to give his house to Jimmy and Debra.[7] He stated that because Leroy had all of the property in the revocable trust, the first thing that needed to be done was to remove the property from the trust. During the discussions, Leroy said that he did not want to retain a life estate in the house or the farm properties. Ammons could not remember if Leroy wanted any strings attached to the transactions. Ammons stated that during the more than two visits that he had with Leroy, despite Leroy's physical problems (i.e., Leroy walked with a cane), he did not see anything wrong with Leroy's mind, could not tell if he was on medication, and did not think that Leroy appeared groggy. He stated that he would not have allowed Leroy to execute the deeds if he thought that Leroy was being unduly influenced. Additionally, Ammons testified that he believed Leroy was aware of what he was signing on January 26; however, Ammons did not have any personal recollection as to whether he was present on January 31 when the other documents were signed. However, Ammons said that most of the documents that Leroy executed were substantially beneficial to Jimmy.

### E. Analysis

Debra argues that there was no evidence presented at trial that established that Leroy lacked capacity and was unduly influenced to execute the deeds. Debra cites Ammons's testimony that he did not see any evidence that Leroy was being unduly influenced as support for her contention.[8] Ammons stated that on January 26, he believed that Leroy was aware of what he was signing. However, Ammons could not recall if he was even present when the January 31 documents were signed, he admitted that most of the documents that he prepared were substantially beneficial to Jimmy, and he said that either Jimmy or Debra were present during all of the meetings he had with Leroy.

Additionally, Brandon and Roy testified that after Jimmy and Debra moved in with Leroy, they noticed a change in Leroy's behavior and demeanor. Brandon and Roy both stated that Leroy became more lethargic and that he seemed depressed. Roy testified that Leroy appeared to be groggy when he would visit him and that he would find Leroy asleep outside on the porch in the middle of the summertime. Leroy stated that he did not intend to transfer the farm properties or his home before his death and that he did not remember signing the deeds to the properties. After Leroy moved out, Brandon and Roy testified that he was less depressed and can do things on his own now that he could not do when he was living with Jimmy and Debra (i.e., Leroy could drive and live by himself).

Further, Leroy was suffering from mental and physical problems at the time of the deed transfers. Debra stated that Leroy was suffering from depression, arthritis, and chronic pain in his back and knees. Additionally, Debra stated that she and Jimmy would fill Leroy's pill bottle with his medications, but she denied giving him any medication that was not prescribed to him. However, Brandon testified that Leroy would take the medication given to

---

7. Jimmy was present during the first consultation.

8. This is the only evidence that Debra points to in her brief.

him by Jimmy and Debra without inquiring into what the medication was or if it was prescribed to him. Debra and Brandon further stated that Leroy would sign any check that was put in front of him to sign by Debra.

We hold that the evidence, when viewed in the light most favorable to the verdict, supports a determination that Leroy was unduly influenced and that he lacked the mental capacity to transfer title to the farm properties and the house to Jimmy at that time; therefore, we overrule Debra's fifth and seventh issues. Additionally, when viewed neutrally, the evidence is not so obviously weak or so greatly outweighed by contrary evidence that it would not support the jury's verdict. Thus, we overrule Debra's sixth and eighth issues. Having held that the jury's determination that Leroy was unduly influenced and lacked the capacity to transfer the property was proper, we need not address her remaining issues regarding the transfers. *See* Tex.R.App. P. 47.1.

## IV. Leroy's Appeal

In Leroy's first issue, he contends that he is entitled to a judgment that conforms to the jury's verdict in regard to the motor home.[9] Leroy specifically claims that because the jury found that the transfer of the motor home was the result of undue influence, the judgment should set aside the transfer of the motor home to Jimmy.[10] In his second issue, Leroy complains that

he is entitled to have "the judgment framed as to give [him] all the relief to which he may be entitled either in law or equity."

## A. Applicable Facts

On January 29, 2001, Leroy transferred the motor home to Jimmy at the Department of Public Safety office. At trial, Debra testified that Leroy had the title to the motor home put in Jimmy's name after she and Jimmy told Leroy that the title should be transferred for insurance purposes. However, Debra also stated that Leroy gave Jimmy the motor home because it was too hard for Leroy to handle and because he did not feel comfortable driving it anymore.[11] She further stated that after Jimmy died, she sold the motor home to Cooper to settle Jimmy's estate. Debra testified that she used the proceeds of the sale of the motor home to pay off the purchase money lien against her Jeep. She stated that the motor home was on one of the farm properties and that there were locks on the barn when Cooper and Charles went to remove it. Debra testified that Cooper and Charles had to cut the locks to get the motor home out of the barn. Additionally, Debra testified that Leroy claimed an interest in the motor home when she sold it to Cooper.

Cooper testified that he purchased the motor home from Debra for $17,000. He stated that the motor home was inside a barn on a farm property and that he had

---

9. In Leroy's brief, he argues that the trial court erred in entering the judgment notwithstanding the verdict. However, after reviewing the brief, it is apparent that Leroy is complaining that the trial court did not enter an order regarding the disposition of the motor home.

10. In the charge, the jury was also asked whether the transfer of the motor home was fair and whether Leroy had sufficient mind and memory when the transfer was made.

However, Leroy bases his appeal on the jury's response to question number two—whether he was unduly influenced to transfer the motor home to Jimmy. Therefore, we will address this issue as to whether Leroy was unduly influenced at the time of the transfer.

11. Debra testified that Leroy would go out and sit in the motor home when it was parked outside of their house.

to cut the locks on the barn to get the motor home out. Additionally, he said that there was a tractor that was blocking the barn door, and Charles had to call a friend to come out with a wrecker so that the tractor could be moved. Cooper testified that he did not know that Leroy was claiming an interest in the motor home until after Debra had transferred the title to him. Additionally, he stated that Leroy had told him that he was giving the motor home to Jimmy because it was uncomfortable for him to drive it any longer.

Leroy stated that he never intended to transfer the ownership of the motor home before he died. Further, Roy stated that Jimmy told him that the motor home was going to be put in Jimmy's name to lower the insurance rates.

On November 5, 2004, the jury found that (1) the transfer of the motor home was fair, (2) Leroy was unduly influenced to transfer title to the motor home, (3) Leroy lacked sufficient mind and memory to understand the nature of transferring the motor home, and (4) Cooper was not a good faith purchaser of the motor home. Debra then filed a motion for JNOV and a motion to disregard the jury findings, to which Leroy responded. In a December 22, 2004 judgment, the trial court did not quiet title to the motor home in Leroy or impose a constructive trust as Leroy had requested.[12] In addition, the order states that the trial court disregarded jury question number six—whether or not Cooper was a good faith purchaser of the motor home. In fact, the judgment does not award the motor home to Debra or Leroy.

### C.  Analysis

Leroy complains that there was sufficient evidence to support the jury's verdict that he was unduly influenced to transfer title to the motor home to Jimmy. Leroy argues that the trial court should have voided the transfer of the motor home from Leroy to Jimmy and from Debra to Cooper. Alternatively, he contends that Debra's Jeep should be held in constructive trust and that the title to the Jeep should be transferred to him.

As stated above, a person is unduly influenced to execute an instrument when there is such dominion and control exercised over the mind of the person, under the facts and circumstances then existing, as to overcome his free will and to substitute the will of another so as to cause him to do what he would not otherwise have done. *Bailey,* 693 S.W.2d at 789.

At trial, Leroy testified that he never intended to transfer the motor home to Jimmy until after Leroy died. Additionally, Debra stated that Leroy only transferred the title after she and Jimmy told Leroy that he should transfer it to lower the insurance rates. Roy testified that Jimmy told him that they transferred the title to lower the insurance rates. After reviewing the evidence, we determine that there was sufficient evidence to support the jury's finding that the transfer of the motor home was the result of undue influence. Additionally, a finding that a transaction is unfair is not a necessary element of undue influence unless a confidential relationship exists (i.e., husband-wife). *See Bohn v. Bohn,* 455 S.W.2d 401, 410–11 (Tex.Civ.App.-Houston [1st Dist.] 1970, writ dism'd). We hold that the jury's finding that Leroy was unduly influenced to transfer title to the motor home to Jimmy is enough to set aside the transaction.

Additionally, Cooper had the burden of proof to establish that he was a bona fide purchaser of the motor home, that he was

---

12. The order does not mention the motor home.

a subsequent purchaser, who paid value, and that he had no notice of the dispute between Leroy and Debra. *See, e.g., Raposa v. Johnson,* 693 S.W.2d 43, 46 (Tex. App.-Fort Worth 1985, writ ref'd n.r.e.) (stating bona fide purchaser under deed had burden of proof of secure finding that he was a bona fide purchaser); *Medley v. Medley,* 683 S.W.2d 877, 879 (Tex.App.-Corpus Christi 1984, no writ) (holding burden of proof is on bona fide purchaser). If a subsequent purchaser cannot show himself to be a bona fide purchaser, then he acquires only the rights that his grantor had. *See Hartel v. Dishman,* 135 Tex. 600, 145 S.W.2d 865, 869 (1940). The charge instructed the jury to only answer the bona fide purchaser question if it found that the transfer of the motor home from Leroy to Jimmy was not fair. However, the jury answered that the transfer was fair, and therefore, could not have answered the bona fide purchaser question. Accordingly, because Cooper failed to secure a finding that he was a bona fide purchaser of the motor home, he acquired only the rights that Debra, his grantor, had in regard to the motor home.

We hold that the trial court should have addressed the issue of title to the motor home. Accordingly, because there is no bona fide purchaser finding and the jury found that Leroy was unduly influenced to transfer title to the motor home, the trial court should have quieted title to the motor home in Leroy. Thus, we sustain Leroy's first and second issues.

## V. Conclusion

Having overruled Debra's fifth, sixth, seventh, and eighth issues, and having sustained Leroy's first and second issues, we modify the trial court's judgment regarding the motor home and render a judgment quieting title to the motor home in Leroy. We affirm the judgment as modified.