# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00631-CV

**Mary Dildine, Individually and as Trustee of the Bonham Family Trust - Trust A and B; Rhonda Adrian, Individually and as Co-Trustee of the Bonham Family Trust - Trust A and B; and Michelle Dunlap, Individually, Appellants**

**v.**

**Donald Bonham and Donnie Bonham, Appellees**

---

**FROM PROBATE COURT NO. 1 OF TRAVIS COUNTY**
**NO. 83,206, HONORABLE GUY S. HERMAN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

This is a will contest consolidated with a suit to set aside certain trust amendments and inter vivos deeds. Appellees Donald and Donnie Bonham challenged their grandmother Dolly Bonham's capacity to execute the will at issue, amend an existing trust document, and transfer certain real property, each of which resulted in property that would otherwise have gone to appellees going instead to appellant Mary Dildine (Dolly's daughter and appellees' aunt) as well as appellants Rhonda Adrian and Michelle Dunlap (Mary's two daughters). The probate court held that Dolly Bonham lacked the requisite capacity during the time period in which the disputed documents were executed and, therefore, that those documents were invalid and of no force or effect. In addition, the court removed Mary Dildine and Rhonda Adrian as trustees of the trusts at issue based on its finding of good cause to do so. The court denied Mary Dildine's request for attorneys'

fees based on its finding that she did not prosecute her application to probate the will in good faith or with just cause. On appeal, appellants challenge each of these actions by the probate court. We affirm the probate court's judgment.

***Factual and Procedural Background***

Elbert and Dolly Bonham had two children, Freddie Bonham and appellant Mary Dildine, each of whom also had two children. Mary had two daughters, appellants Rhonda Adrian and Michelle Dunlap. Freddie had two sons, appellees Donald and Donnie Bonham. Freddie died in 1991.

In 1995, Elbert and Dolly executed a will (the "1995 Will") and created and funded the Bonham Family Trust. In accordance with a history of Elbert and Dolly treating their children Freddie Bonham and Mary Dildine relatively equally, under the terms of the 1995 Will and original trust Mary was to receive a 363-acre tract of ranch land, Freddie's sons Donald and Donnie were to receive the 292-acre ranch in Dripping Springs on which Elbert and Dolly's residence was located, and the remainder of the trust estate was to be divided 50% to Mary and 25% each to Donald and Donnie. In 1996, the 363-acre property was gift deeded to Mary, and the trust was amended in August 1997 to remove that property from the trust corpus. Also under the 1997 amendment, Mary's share of the residual was reduced from 50% to 30%, and her daughters Rhonda and Michelle were each given a 10% share. In June 2001, the trust was amended a second time to change the successor trustees—in the event both Elbert and Dolly ceased serving as trustee—to Mary, Rhonda, Donald, and Donnie.

2

In November 2000, Dolly suffered a stroke, which resulted in aphasia (speech difficulties) and some physical control problems. The parties dispute the stroke's impact on Dolly's cognitive abilities. For the sake of Dolly's care, in March 2001 Elbert and Dolly moved from their house on the 292-acre ranch into Carestone, an assisted living facility, while Donald and his wife Teresa remained on the ranch property living in a mobile home. In July 2002, Elbert suffered a stroke. Following Elbert's stroke, in September 2002 Elbert and Dolly moved from the assisted living facility into Hill Country Care, a nursing home.

Elbert died on February 5, 2003. Upon Elbert's death the Bonham Family Trust, pursuant to its terms, was divided into three parts: Trust A, a revocable survivor's trust holding Dolly's separate property and one-half interest in the community property; Trust M, an irrevocable trust holding property for the purpose of the payment of taxes; and Trust B, an irrevocable bypass trust holding the balance of the assets. At the time of Elbert's death, under the terms of the 1995 Will and Trusts A and B as amended, Donald and Donnie Bonham were to receive the entire 292-acre ranch together with half of the residuary and composed half of the four successor trustees.

After Elbert's death, Dolly Bonham executed documents that had the effect of reducing the property to be received by Donald and Donnie. On November 13, 2003, Dolly executed a "Third Amendment" to Trust A, appointing Dolly *or* Mary as trustees, and Mary's husband Charles Dildine and their daughter Rhonda as the successor trustees. Contemporaneously with this amendment, Mary executed a new will (the "2003 Will") leaving her personal and household effects and the residuary of Trust A to Mary, Rhonda, and Michelle. In early 2004, Dolly initiated partition of the 292-acre ranch into five tracts, identified in this lawsuit as Tracts A, B, C, D, and E. Having

3

encountered surveyors on the ranch and learning of the planned partition, Donald and Donnie filed suit against Dolly and Mary in March 2004 to enjoin any partitioning or gifting of the ranch, alleging that Dolly was incompetent to do so. On October 5, 2004, Dolly executed a "Fourth Amendment" to Trust A, whereby 50% of the 292-acre property would be divided equally between Michelle and Rhonda (Donald and Donnie remained entitled to a portion of the property as a result of the irrevocable Trust B), and the remainder of the trust estate would pass 60% to Mary, 20% to Michelle, and 20% to Rhonda. On January 25, 2005, Dolly executed Special Warranty Deeds (the "2005 Deeds") conveying Tract A to Rhonda, Tract D to Michelle, Tracts B and C to Trust B (for the benefit of Donald and Donnie), and Tract E to Trust A (by which, according to testimony at trial, Dolly could obtain additional income if necessary). On May 16, 2005, while Donald and Donnie's lawsuit was pending, Dolly died.

Mary Dildine filed an application for appointment as independent executor of the Estate of Dolly Bonham. Donald and Donnie Bonham filed a will contest, and sought declaratory relief that the 2003 Will, the Third and Fourth Amendments, and the 2005 Deeds were invalid. The Bonham brothers alleged that Dolly lacked capacity to enter into the transactions, that Dolly was unduly influenced by Mary, and that Dolly was suffering from a delusional state at the times the instruments were executed. Mary asserted a counterclaim for declaratory relief that the 2005 Deeds were valid distributions and sought attorneys' fees for defending the 2003 Will. Following a bench trial, the probate court found that Dolly lacked testamentary capacity, contractual capacity, and capacity to formulate an intent to make a gift "at all times from the year 2002 until her death on May 16, 2005." The court declared the 2003 Will, the Third and Fourth Amendments to the

4

Bonham Family Trust, and the 2005 Deeds invalid and of no force or effect, and denied Mary's application to probate the 2003 Will. The probate court also removed Mary and Rhonda as trustees of the Bonham Family Trust and denied Mary's request for attorneys' fees. Mary Dildine and her daughters Michelle and Rhonda appeal the judgment.

*Analysis*

Appellants present three points on appeal: (1) the evidence is legally and factually insufficient to support the trial court's finding that Dolly Bonham lacked capacity; (2) the evidence is legally and factually insufficient to support the trial court's finding of good cause for removal of Mary and Rhonda as trustees; and (3) there is no evidence to support the trial court's finding that Mary failed to prosecute her application to probate the will in good faith or with just cause, on which finding the court based its denial of Mary's request for attorneys' fees out of the estate.

### *Dolly Bonham's Capacity*

In their first point on appeal, appellants assert that the evidence is legally and factually insufficient to support the trial court's finding that Dolly Bonham lacked testamentary, contractual, and intent-to-gift capacity from the year 2002 until her death in 2005. Testamentary capacity requires that the testatrix, at the time of execution of the will, have sufficient mental ability to understand she is making a will, the effect of making the will, and the general nature and extent of her property, know her next of kin and the natural objects of her bounty, and have sufficient memory to collect in her mind the elements of the business transacted and hold them long enough to perceive their obvious relation to each other and form a reasonable judgment about them. *See*

5

*Long v. Long*, 196 S.W.3d 460, 464 (Tex. App.—Dallas 2006, no pet.); *In re Estate of Grimm*, 180 S.W.3d 602, 605 (Tex. App.—Eastland 2005, no pet.).  Appellants, as proponents of the 2003 Will, have the burden of proving Dolly's testamentary capacity.  *See Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983); *Long*, 196 S.W.3d at 464.  To establish mental capacity to execute a deed or contract, the grantor at the time of execution must have had sufficient mind and memory to understand the nature and effect of her act.  *See Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.).  With respect to Dolly's contractual capacity, the burden of proof rests on the Bonham brothers, as the parties seeking to set aside the deeds and trust amendments based on the grantor Dolly's lack of mental capacity.  *See id.* at 652.

For a legal sufficiency challenge, we review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not.  *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).  In reviewing appellants' legal sufficiency challenge to the trial court's finding of lack of capacity to execute the 2003 Will—an issue for which appellants had the burden of proof—we will sustain their point on appeal based on the legal sufficiency of the evidence only if the evidence conclusively establishes, as a matter of law, that Dolly had capacity.  *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).  The test is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.  *City of Keller*, 168 S.W.3d at 827.  In reviewing appellants' legal sufficiency challenge to the trial court's finding of lack of capacity to execute the Third and Fourth Amendments and the 2005 Deeds—an issue for which the Bonham brothers had the burden of proof—we will sustain appellants' complaint if the record reveals (1) the complete

6

absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

For a factual sufficiency challenge, we must consider and weigh all the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Dow Chem. Co.*, 46 S.W.3d at 242. In reviewing appellants' factual sufficiency challenge to the trial court's finding of lack of capacity, we will set aside the judgment only if the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The Bonham brothers introduced into evidence Dolly's medical records from the time of her stays at Carestone and Hill Country Care, and their expert witness Dr. Jaron Winston—board certified in general psychiatry and geriatric psychiatry—testified concerning his assessment of those medical records. Dr. Winston's testimony addressed the records of Dr. Gordon Sixty, a clinical psychologist who met regularly with Dolly at Hill Country Care, and Dr. Mark Dawson, Dolly's attending physician. According to Dr. Winston, Dr. Sixty's notation following his initial consultation with Dolly in December 2002 of "probable frontal lobe impairment" with decreased decision-making, reasoning, and judgment, his progress notes from December 2002 through April 2005, the "Mini-Mental State Examination" results administered by Dr. Sixty in 2002 and

7

2004, and his recommended prescriptions together showed that Dolly experienced a decrease in mental functioning and cognitive reasoning abilities resulting from her stroke in 2000. Dr. Winston found Dr. Sixty's initial diagnosis in 2002 of Dolly's conditions that included "Vascular Dementia"—and Dr. Dawson's prescription for medication based on that diagnosis—to be consistent with this finding. The "physician's orders," which were signed by Dr. Dawson, beginning in October 2002 stated that Dolly was "incapable of understanding/exercising rights" and, therefore, her daughter Mary Dildine would be required to give consent for medical procedures. Dr. Winston identified further evidence of Dolly's decreased cognitive abilities in the Hill Country Care nurses' notes, Dolly's treatment care plan for therapy staff from 2003, her rehabilitation therapy notes from late 2004, and monthly nursing summaries from late 2003 through early 2005. Based on these medical records, Dr. Winston concluded that from 2002 through 2005 Dolly did not have testamentary or contractual capacity.[1]

In response, appellants rely on multiple witnesses who testified to Dolly's capacity based on their personal experiences and observations, including appellants Mary and Rhonda; Dr. Dawson; Jim Dunlap and his daughter Michele Dunlap,[2] the estate planning attorneys who

---

[1] Appellants argue that Dr. Winston's testimony does not support the trial court's finding of a lack of testamentary capacity because he did not testify as to the specific date at issue—November 13, 2003. *See Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968) (proper inquiry on issue of testamentary capacity is the condition of the testator's mind on the day will was executed). However, a testatrix's conduct on dates prior or subsequent to a will's execution has "probative force" if the evidence demonstrates the condition persists and has some probability of being the same condition that existed at the time of the will's execution. *See id.* Dr. Winston testified that the medical records were evidence that Dolly's incapacity was continuous through the time of the 2003 Will's execution.

[2] The Dunlap witnesses are not related to appellant Michelle Dunlap.

prepared the 2003 Will and Third and Fourth Amendments; Allen Herrington, the attorney who prepared the 2005 Deeds and represented Dolly and Mary in the 2004 lawsuit filed by the Bonham brothers; Nelson Davidson, a family friend and attorney who prepared a tax form for Dolly in April 2004; Laura Booth, an employee of Hill Country Care who interacted socially with Dolly; and Reverend John McCullough, Dolly's pastor, who made social visits to her once or twice a month after Elbert died. Appellants argue that these witnesses' "copious testimony" overcomes Dr. Winston's reliance on "selected examples" from Dolly's medical records.

However, Dr. Winston testified that evidence of Dolly's social functioning was not inconsistent with his conclusions of cognitive deterioration and incapacity, as some functions that had been engrained would take a longer time to be lost. He noted that while Dolly's speech and daily activities might have improved from her initial condition following her stroke, the medical records indicated that her cognitive skills continued to deteriorate. Moreover, Donald, his wife Teresa, and Donnie each testified regarding their own observations that indicated Dolly lacked capacity, including her forgetting Donald's relationship to the 292-acre ranch property in 2002 and her failure to recognize Donnie toward the end of her life.[3]

---

[3] In addition, there was evidence suggesting that some of appellants' witnesses' recollections were not entirely reliable. For instance, after repeatedly affirming Dolly's capacity as of the date Dolly executed the 2003 Will and Third Amendment, on cross examination Michele Dunlap admitted that her testimony was based not on her actual recollection of events, but on her standard office practices. Jim Dunlap denied ever having met or spoken with the Bonham brothers, but Donald testified to a meeting between them in Dunlap's office and introduced into evidence a cancelled check representing payment for legal advice received. Although Dr. Dawson testified that he never had any reason to think Dolly was disoriented, he also admitted approving medications based on Dr. Sixty's diagnoses and that he would have no reason to disagree with the medical record in the event it demonstrated a deterioration of Dolly's cognitive function and reasoning ability. Mary Dildine denied any knowledge of her mother's sleeping difficulty, anxiety, and depression

The testimony as to Dolly Bonham's capacity is conflicting and disputed. The trial court heard the witnesses and had the opportunity to observe their appearance and demeanor, and concluded that Dolly lacked capacity. The trial court, sitting as the finder of fact in this case, is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Schindler v. Schindler*, 119 S.W.3d 923, 930 (Tex. App.—Dallas 2003, pet. denied). The trial court's finding of incapacity is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust, and the evidence to support the finding is more than a scintilla. We conclude that the evidence at trial was legally and factually sufficient to support the trial court's finding that Dolly Bonham did not have testamentary capacity at the time of execution of the 2003 Will, and did not have the requisite mental capacity to contract at the time of execution of the Third and Fourth Amendments of the trust instruments as well as the 2005 Deeds.

*Removal of Trustees*

In their second point on appeal, appellants assert that the evidence is legally and factually insufficient to support the trial court's finding good cause for removing Mary Dildine and Rhonda Adrian as trustees of the Bonham Family Trust. A court may, in its discretion, remove a trustee for any of the following reasons:

diagnoses, despite the medical records to the contrary and her obligation to provide consent for Dolly's medical care. Mary also denied any knowledge of Dolly making a 911 call in March 2004 regarding a possible burglary at her ranch home several months after the date the incident actually took place. However, the nurses' reports described a conversation about the subject between the nurses and Mary, including a note that Mary "stated we could call her if we need to talk when the police come."

10

(1)    the trustee materially violated or attempted to violate the terms of the trust and the violation or attempted violation results in a material financial loss to the trust;

(2)    the trustee becomes incapacitated or insolvent;

(3)    the trustee fails to make an accounting that is required by law or by the terms of the trust; or

(4)    the court finds other cause for removal.

Tex. Prop. Code Ann. § 113.082(a) (West 2007).  The trial court found "good cause" for removing Mary and Rhonda as trustees.

Appellants argue that the evidence does not establish any mismanagement or improper conduct on the part of either Mary or Rhonda.  However, there were actions taken by Mary and Rhonda that, taken together, could constitute sufficient evidence for their removal as trustees by the trial court.  Mary spent trust funds, with Rhonda's approval, on blading work to build a road accessing the partitioned tracts of the 292-acre ranch even though it caused the destruction of several large oak trees and Donald objected to the work.  Mary also spent trust funds to pay her lawyers to litigate her claims against Donald and Donnie, and during the month prior to Dolly's death, disbursed trust funds of $10,000 each to Rhonda and Michelle, with no amounts disbursed to Donald or Donnie.  When Donald and Donnie contacted Rhonda in an attempt to set a trustee meeting in August 2005, Rhonda refused, calling it a "complete waste of time."  Moreover, in August 2006, Rhonda had a locked gate installed at the only entrance to the ranch so as to keep

11

Donald from accessing any of the trust property.[4]  We conclude that the evidence is legally and factually sufficient to support the trial court's removal of Mary Dildine and Rhonda Adrian as trustees.

*Attorneys' Fees*

The probate court denied all parties' requests for attorneys' fees.  Appellants in their third point on appeal assert that the court erred in finding Mary Dildine was not entitled to recover her attorneys' fees out of the estate.  For Mary to be so entitled, the probate code requires that her attempt to probate the 2003 Will have been made in good faith, regardless whether the probate was successful or not:

> When any person designated as executor in a will or an alleged will, or as administrator with the will or alleged will annexed, defends it or prosecutes any proceeding in good faith, and with just cause, for the purpose of having the will or alleged will admitted to probate, whether successful or not, he shall be allowed out of the estate his necessary expenses and disbursements, including reasonable attorney's fees, in such proceedings.

Tex. Prob. Code Ann. § 243 (West 2003).  Appellants contend that even if we affirm the probate court's finding that Dolly lacked testamentary capacity to execute the 2003 Will, there is no evidence that Mary did not pursue the probate proceedings in good faith.

There was, however, some evidence from which the probate court could have concluded that Mary and Rhonda were the parties actually responsible for the alterations to Dolly's

---

[4]  There was also evidence that, in December 2006, Mary or Rhonda had a trench dug across the gravel road on the ranch, which was the only road available for Donald and Teresa to access Tract E, where the memorial site for their deceased son is located.

disposition of property made by the 2003 Will. For instance, many of the concerns about Donald and Donnie's relationship with the 292-acre ranch property, which according to Mary and Rhonda's testimony at trial had caused Dolly to reduce the Bonham brothers' share of the inheritance, initially appeared in an April 2001 letter that Mary wrote to her parents, complaining that the split in property under the 1995 Will was unfair. Appellants introduced into evidence a letter to Donald—consisting of two typewritten pages, dated April 13, 2004, and signed by Dolly—making a number of allegations against Donald and "terminating all business and personal agreements" with him. Rhonda testified that she merely typed up what Dolly had dictated. However, the medical record included a Mini-Mental State Examination taken by Dolly on April 14, 2004, only one day later, and in connection with the exam, Dr. Sixty noted that Dolly, after attempting to write a three-word sentence, "wasn't sure what she tried to write," and said she "has ideas in head, but words won't come."[5] Also, the 2004 eviction lawsuit against Donald, which Mary alleged was on her mother Dolly's behalf, was signed only by Mary. There is some evidence to support a determination that Mary did not tender the 2003 Will for probate in good faith.

Given our affirmance of the trial court's finding that Dolly did not have testamentary or contractual capacity at relevant times, and the evidence from which the trial court could have concluded that Mary and Rhonda were the parties actually responsible for the 2003 Will's distribution of property in their favor, we conclude that the trial court did not err in denying Mary's request for attorneys' fees.

---

[5] Dr. Winston testified that the April 13, 2004 letter was "amazingly detailed and there is no way that [Dolly] could have done this."

*Conclusion*

Finding no reversible error, we affirm the judgment of the probate court.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   March 12, 2009