**Beverly Foster TURNER, Appellant,**

v.

**Kelly Foster HENDON, Appellee.**

**No. 08–07–00234–CV.**

Court of Appeals of Texas,
El Paso.

Oct. 30, 2008.

---

Kirk L. Pittard, Durham & Pittard, LLP, Dallas, for Appellant.

Paul Craig Laird II, Ashley & Laird, L.C., Irving, for Appellee.

Before CHEW, C.J., McCLURE, and CARR, JJ.

**OPINION**

KENNETH R. CARR, Justice.

Appellant, Beverly Foster Turner, brings this appeal of a judgment awarding Kelly Foster Hendon damages and declaring a deed that conveyed property to Turner void and unenforceable in favor of Appellee. We reverse the judgment of the trial court and render judgment for Turner.

**I. BACKGROUND**

Turner is the daughter of the late Gladys Foster. Hendon and her sister, Courtney Alsobrook, are the granddaughters of Foster and the daughters of Foster's deceased son.[1] On or about Novem-

---

1. The sisters are, therefore, Turner's nieces.

ber 10, 1998, at the age of eighty-six, Foster fell and broke her hip. At some point, Foster also suffered a heart attack. Foster was admitted to Baylor Hospital in Irving, where she remained until December 9. During part of her time in the hospital, Foster was in traction. Because she had previously undergone an aortic valve replacement and heart bypass surgery, Foster was advised that she was not a good candidate for hip replacement surgery, and she decided against it. While still hospitalized, Foster executed a deed that granted her real property, which included her house, to Turner. Foster retained a life estate in the property.

Upon her release from the hospital, Foster was moved to a rehabilitation facility in Winnsboro, Texas, that Turner had arranged for her. Foster remained at the rehabilitation facility for a period of time and then moved into Turner's house and stayed with Turner for the next two and one-half to three months. At Foster's request, Hendon and Alsobrook drove Foster back to her house in Irving.

On July 14, 2000, Foster executed a will that contained a provision devising one-half of the Irving property to Turner and one-half to Hendon and Alsobrook. The will named Hendon as the executor. In January 2004, Hendon learned that the Irving property had been gifted by deed to Turner. Foster died on April 4, 2004.

On December 8, 2004, Hendon filed this lawsuit as administrator of Foster's estate seeking, among other things, a declaration that the deed was ineffective, on the basis that Foster lacked sufficient mental capacity to execute the deed and was under the undue influence of Turner at the time of the deed's execution. Hendon also sought actual damages, exemplary damages, and attorney's fees. Following a trial, the jury

rendered a unanimous verdict that Foster lacked sufficient mental capacity when she executed the deed and that Turner exerted undue influence over her. The jury also found that, in the exercise of reasonable diligence, Gladys Foster should not have discovered that she had executed the deed within four years after she regained her mental capacity and was no longer under undue influence. Hendon was awarded $57,000 in actual damages and $14,000 in exemplary damages.

On appeal, Turner argues that the evidence was legally and factually insufficient to support the jury's findings as to mental incapacity, undue influence, and actual and punitive damages. Appellant also contends that Appellee's claims were barred by limitations.

## II. DISCUSSION

### A. Standard of Review

 A "no-evidence" or legal-insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. *Serrano v. Union Planters Bank, N.A.,* 162 S.W.3d 576, 579 (Tex.App.-El Paso 2004, pet. denied). When, as here, the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Id.* (citing *In re Estate of Livingston,* 999 S.W.2d 874, 879 (Tex.App.-El Paso 1999, no pet.)). An appellate court will sustain a legal-insufficiency or "no-evidence" challenge, if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005).

 "Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. *Cass v. Stephens,* 156 S.W.3d 38, 55 (Tex.App.-El Paso 2004, pet. denied), *cert. denied,* —— U.S. ——, 128 S.Ct. 115, 169 L.Ed.2d 26 (2007). In a factual-insufficiency challenge, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact, as well as evidence which tends to disprove its existence. *Corrales v. Department of Family & Protective Servs.,* 155 S.W.3d 478, 488–89 (Tex.App.-El Paso 2004, no pet.). If the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained. This is true even if the finding is supported by more than a scintilla of evidence and even though reasonable minds might differ as to the conclusions to be drawn from the evidence. *Id.* at 489.

### B. Mental Incapacity

 In her first issue, Turner argues that the evidence was legally and factually insufficient to support the jury's finding that Foster lacked sufficient mental capacity to understand the nature and consequences of her actions in executing the deed. "The law presumes that the grantor of a deed had sufficient mental capacity at the time of its execution to understand his legal rights, and for that reason the burden rests on the person seeking to set aside the deed to show lack of mental capacity of the grantor at the time the deed was made." *Bradshaw v. Naumann,* 528 S.W.2d 869, 873 (Tex.Civ. App.-Austin 1975, writ dism'd); *Jackson v. Henninger,* 482 S.W.2d 323 (Tex.Civ.App.- Austin 1972, no writ). Absent proof and determination of mental incapacity, a per-

son who executes a document is presumed to have read and understood it. *Dubree v. Blackwell*, 67 S.W.3d 286, 289 (Tex.App.-Amarillo 2001, no pet.). "Mental capacity" means that, at the time of the execution of the deed, the grantor must have had sufficient mind and memory to understand the nature and effect of his act. *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex.App.-Fort Worth 2006, no pet.). If the grantor is mentally capable of understanding the details of the conveyance and the consequences resulting from it, he has mental capacity to make a deed. *Bradshaw*, 528 S.W.2d at 873. Elderly persons are not presumed to be incompetent. *Dubree*, 67 S.W.3d at 289. To demonstrate a grantor's mental capacity at the time of the conveyance, evidence of his mental capacity prior, and subsequent, to the time of the conveyance is admissible. *Decker*, 192 S.W.3d at 652; *Jackson*, 482 S.W.2d at 325; *Pollard v. El Paso Nat'l Bank*, 343 S.W.2d 909, 913–14 (Tex.Civ.App.-El Paso 1961, writ ref'd n.r.e.).

## 1. Hendon's Testimony

At trial, Hendon testified that she visited Foster in the hospital and that her grandmother was in a great deal of pain and seemed tired. Hendon was not at the hospital when Foster executed the deed. Hendon testified that, after Foster returned to her home in Irving, she and Alsobrook would visit her about once a week. The sisters helped her by buying her groceries and taking her to her doctor's appointments.

Hendon learned of the deed in January of 2004. When Foster was asked about the deed, she did not remember signing anything and said that the only document which she remembered signing was something to get her out of the hospital. Hendon also testified that, after Foster learned of the deed, Foster stated that she could not believe "that Beverly would do something like that."

On cross-examination, Hendon was asked whether she had any proof that Foster did not have sufficient mind and memory to know what she was doing when she deeded the property to Turner, while in the hospital. Hendon responded that she did not have any proof. When asked what proof she had as to undue influence, Hendon testified Foster told her and Alsobrook that she did not remember signing anything, except to get out of the hospital. Hendon also believed that Foster's signature on the deed was slanted, that it was "dark," and that Foster "normally didn't press down that hard."

## 2. Dr. Biard's Testimony

The video deposition of Dr. Maria Biard, Foster's physician, was played to the jury. Dr. Biard testified that she had practiced medicine in Irving since January 1997 and that she had been on staff at Baylor Hospital in Irving since that year. Foster became a patient of Dr. Biard's in late 1998 or early 1999. Dr. Biard saw Foster regularly from that time until her last visit, on March 11, 2004.

Dr. Biard was not Foster's treating physician when she suffered her broken hip in November 1998. Based on her review of Foster's medical records, Dr. Biard testified that, during her hospital stay, Foster was prescribed aspirin, Captopril (a hypertensive medicine), Senopril (possibly for a urinary tract infection), Heparin (blood thinner), Periactin (appetite stimulant), Tenormin or Atenolol (beta blocker, antihypertensive), nitroglycerin, Darvocet (pain killer), milk of magnesia, Tylenol, and Xanax. Dr. Biard testified that Darvocet might make some people drowsy; however, according to the hospital records, the Darvocet prescription was discontinued as

to Foster on November 23.[2] Dr. Biard testified that Xanax is primarily used for panic disorder and chronic anxiety and can make a person very drowsy. Dr. Biard prescribed Xanax for Foster subsequent to her hospital stay and believed Foster "seemed fine."

Dr. Biard testified that she imagined that Foster would have been in a great deal of discomfort every time she moved her hip while in the hospital. In addition to the broken hip, Foster had suffered a heart attack. Foster suffered from heart disease and had previously undergone an aortic valve replacement. The hospital records indicated that Foster denied having chest pain and did not have shortness of breath. Dr. Biard described Foster's condition as serious. When asked whether Foster should have left the hospital, Dr. Biard responded that Foster was doing well, but she would have been concerned about transporting her and about Foster's pain.

Dr. Biard was asked whether, from January 1999 forward, she noted any competency issues regarding Foster. Dr. Biard responded that she had not, that Foster answered questions appropriately, that her thought processes were normal, that she made her own decisions, and that she was competent. Dr. Biard saw Foster for an office visit on May 22, 2000. Her notes from that day stated that Foster was managing alone at home and that she looked great. Dr. Biard testified that, had Foster not been able to function mentally, she would have made a note of it in her records.

Dr. Biard was also asked about Foster's ability to function with regard to bathing herself and getting around. Dr. Biard responded that she would see Foster every three to six months and that she was never dirty, disheveled, nor unkempt. Dr. Biard also believed that Foster was fiercely independent. However, Dr. Biard testified that she was not present when Foster was in the hospital in December of 1998 and could not state whether Foster was competent to sign the deed and understand what she was doing.

### 3. James Widener's Testimony

The deed was prepared and notarized by James Widener, an attorney who practiced in Irving. Widener did not recall whether the deed was signed by Foster in his office or somewhere else. Widener testified that Turner was sent a copy of the deed after it was executed. Widener billed Turner for the preparation of the deed. Among other things, Widener's file contained a handwritten letter with Foster's name and address, Turner's name and partial address, and a purported legal description of the property. Widener did not recall Foster's execution of the deed, but testified that when providing a deed for execution, he typically gives a brief explanation of the document and asks the grantor whether that is what he wants. Widener also requires identification of the grantor and asks whether he acknowledges executing the instrument for the purposes and considerations expressed therein. Widener testified that, if he had any doubt in his mind as to a grantor's mental capacity or was aware of undue influence, he would not notarize such a deed.

Widener was asked on cross-examination whether he knew a man named Dan Medkin, who was Turner's cousin. Widener responded that he had known him most of his life and that Medkin was a real estate broker, but that, if he had known that Medkin was related to Turner, he had forgotten that fact.

**2.** Fifteen days prior to Foster's execution of the deed.

### 4. Olga Morales's Testimony

Olga Morales was Foster's neighbor, and she witnessed the execution of Foster's will in July 2000. Morales testified that she and Foster were close friends. Morales did not have any doubts that Foster knew what she was doing when she signed the will. Hendon and Alsobrook visited Foster often. According to Morales, Foster had a close relationship with the sisters, because they were taking care of her and Foster relied on them. Foster made negative comments to Morales about Turner. In the last four years of Foster's life, Morales did not see Turner at Foster's house, though she admitted on cross-examination that she did not know how many times Turner and Foster talked on the telephone or how many times Turner visited Foster. Morales was not present when Foster executed the deed.

### 5. Ellen Foster's Testimony

Foster's sister-in-law, Ellen Foster, testified that she visited Foster in the hospital after she broke her hip and described her condition as "miserable." Ellen did not believe that Foster had lost any of her mental faculties when she moved back into her home from the hospital. Ellen never had any discussions with Foster concerning the deed or the will. Ellen testified that Hendon and Alsobrook had a good relationship with Foster, but that, after Foster moved back home, she and Turner did not have a good relationship.

### 6. Vicki Washington's Testimony

Vicki Washington served as Foster's home-care provider after she moved back into her house in Irving. Washington worked in that capacity for six years, until Foster's death. She saw Foster six days a week. Washington testified that Foster was "in her right mind" during this time. Washington testified that Hendon and Alsobrook would visit Foster every week and that they had a close relationship. Washington described Turner's relationship with Foster as not all bad, but not all good.

### 7. Turner's Testimony

Turner testified that, at the time Foster broke her hip, she was in the process of moving back to Texas from Arizona. Upon learning of Foster's accident, she flew to Dallas from Arizona to visit her. Turner visited her almost every day. Turner testified that Foster made the decision not to have surgery on her hip. Turner was asked whether she visited her mother in the hospital on December 3, 1998.[3] Turner testified that she did not visit her mother that day, because she left Dallas on a 9:20 a.m. flight to Chicago to attend her son's graduation. She returned to Dallas on December 7. When asked whether she was present when the deed was signed, Turner stated that she did not know and that she might have been at the hospital, if it had been signed on any other day. Turner testified that, to the best of her recollection, she was in Illinois when Foster executed the deed. She did not know who was present when Foster signed the deed. Turner subsequently testified that she may have been at the hospital when Widener came to see her mother concerning the deed and that Dan Medkin may have introduced them. Turner did not talk to Widener, but shook his hand and left. Turner paid James Widener for the deed preparation by check dated December 9, 1998.

---

**3.** The deed was dated December 3, 1998. Widener's acknowledgment of it appears to be dated December 8.

Turner arranged for Foster to go to the rehabilitation facility in Winnsboro after she was released from the hospital. Turner paid the amounts owed for the rehabilitation facility that Foster's insurance did not cover. After two months, Foster moved in with Turner. Turner testified that she saw her mother about every month to six weeks after she moved back to Irving. Turner paid the property taxes on the property after the deed was executed.

When asked about the will and whether her mother had a sharp mind up until the time she died, Turner stated that Foster was mentally sharp when she broke her hip and afterward, but that she was too highly medicated when she moved back home and that her mental capacity deteriorated after she returned home. Turner testified that she asked her mother to live with her, but Foster refused. Turner testified that Foster knew what she was doing on December 8, that "[s]he knew me, she knew everybody, she could carry on a conversation." As to the slanted appearance of Foster's signature on the deed, Turner stated that Foster had a habit of slanting her signatures. Turner introduced a check signed by Foster dated June 3, 1999. In it, Foster's signature has the same slanted appearance as that on the deed. Turner testified that Foster had told her in 1992 that the house was Turner's because her brother "had already gotten his share."

## 8. Legal Sufficiency

The evidence offered by Hendon was that Foster was eighty-six years old at the time of her injury; that she broke her hip and suffered a heart attack; that she was in pain and "seemed tired" while in the hospital; that she was under various medications, at least one of which could make a person drowsy; that Foster's signature on the deed, though legible, was not parallel to the signature line, but was slightly slanted; that approximately eighteen months after she had executed the deed granting the property to Turner, Foster executed a will in which she devised half of her property to Turner and half to Hendon and Alsobrook; that, in 2004, Foster told Hendon that she did not remember signing the deed and that she could not believe that Turner would have done that to her.

A party seeking to set aside a deed because of the grantor's lack of mental capacity must offer probative evidence that the grantor did not have sufficient mind and memory to understand the nature and effect of her act. For instance, in *Bradshaw*, 528 S.W.2d at 870, the plaintiff brought an action to cancel a deed executed by her parents, Ollie and Oscar Bradshaw, that reserved a life estate for themselves and conveyed the property to their son, to the exclusion of the plaintiff. Following Mr. Bradshaw's death several years later, Mrs. Bradshaw and the son granted an option to purchase a portion of the property to a third party. She thereafter executed a will in which she devised her entire estate to her son. Following Mrs. Bradshaw's death, the plaintiff claimed that Mr. Bradshaw had been under undue influence when he executed the deed and that Mrs. Bradshaw lacked the requisite mental capacity to execute the deed. The jury agreed with the plaintiff's allegations. On appeal, the judgment was reversed.

Witness testimony offered concerning Mrs. Bradshaw several years after execution of the deed was that she was elderly, nearly blind, did not immediately recognize people she had known, was dirty, and had sores on her face and long toenails. *Id.* at 873. In addition, her house was dirty and unkempt. The appellate court determined that this evidence was of no probative value, because it related to a period years

removed from the deed's execution and was not probative of Mrs. Bradshaw's mental capacity to make a deed years before. There was also testimony that, several months before executing the deed, Mrs. Bradshaw had been found locked in her house, lying on her bed fully-clothed, feeding chickens. *Id.* at 874. There was also testimony that she was ill and unstable. The court reasoned that "[t]his conduct may be unconventional, even eccentric, and, to some, bizarre, but without more, related directly to business understanding and acumen, it has no probative value to show want of mental capacity to make a deed." *Id.; see also Hollar v. Jowers,* 310 S.W.2d 721 (Tex.Civ.App.-Eastland 1958, writ ref'd n.r.e.) (no probative evidence of lack of mental capacity in action to set aside deed, where there was no evidence of any unnatural, peculiar, or irrational action on the part of grantor at or near the time of execution); *Dubree,* 67 S.W.3d at 290 (appellant did not conclusively show that grantor lacked mental capacity, where no evidence was offered concerning her mental condition at the time she executed the deed); *Horton v. Horton,* 965 S.W.2d 78, 86 (Tex.App.-Fort Worth 1998, no pet.) (evidence that testator had physical infirmities, was taking pain medication, and suffered from hallucinations at times was not sufficient to prove lack of testamentary capacity); *Wilson v. Estate of Wilson,* 593 S.W.2d 789, 792 (Tex.Civ.App.-Dallas 1979, no writ) (evidence that the testatrix was of advanced age, had suffered minor strokes, and was hospitalized with a broken hip at the time of execution of the will was insufficient to prove lack of mental capacity).

 No evidence was offered relating to Foster's mental capacity at or near the time that she executed the deed. Hendon did not offer any testimony as to Foster's mental condition. She testified that she was not at the hospital when the deed was executed, and she admitted on cross-examination that she did not have any proof that Foster did not have sufficient mind and memory to know what she was doing when she executed the deed. Foster's physician, Dr. Biard, offered no testimony relating to Foster's mental capacity at the time she was in the hospital. None of the other witnesses offered any testimony relating to Foster's mental condition during that time. Some evidence was offered relating to Foster's mental capacity subsequent to the execution of the deed. However, in this case, the evidence concerned Foster's mental capacity well after execution of the deed. Moreover, the testimony in this regard by Dr. Biard, Olga Morales, Ellen Foster, and Vicki Washington was that Foster was mentally competent and aware of what she was doing after she moved back home, until her death. Indeed, Hendon takes the position on appeal that probation of Foster's will established that Foster was competent as of July 14, 2000, the date of the will's execution. Although Turner testified that Foster's memory declined prior to her death, that testimony referred to the time after Foster had ceased living at Turner's house and returned to her house in Irving, which was several months after the execution of the deed. Accordingly, we sustain this issue.

## C. Undue Influence

 In her second issue, Turner challenges the jury's finding that she exerted undue influence over her mother with respect to the deed. In Texas, rules guiding the determination of undue influence apply substantially alike to wills, deeds, and other instruments. *Bradshaw,* 528 S.W.2d at 871. Undue influence implies the existence of mental capacity subjected to and controlled by an influence that is dominant. *Id.* In order to establish

undue influence, a party has the burden to show: (1) the existence and exertion of influence; (2) the effective operation of an influence so as to subvert the will or overpower the mind of the grantor at the time of the execution of the deed; and (3) the execution of a deed the maker would not have executed, but for such influence. *Rothermel v. Duncan,* 369 S.W.2d 917, 922 (Tex.1963). The elements of undue influence may be proved by circumstantial, as well as direct, evidence. *Id.* "The exertion of undue influence cannot be inferred by opportunity alone." *Cotten v. Cotten,* 169 S.W.3d 824, 827 (Tex.App.-Dallas 2005, pet. denied). There must be some evidence to show that the influence was not only present, but in fact exerted, with respect to the making of the instrument. Although evidence of age and the common maladies of age may be considered as establishing the grantor's physical incapacity to resist or the susceptibility of her mind to an influence exerted, this alone does not establish that the grantor's mind was in fact subverted or overpowered at the time of the execution of the instrument in question. *Id.* "The circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence." *In re Estate of Steed,* 152 S.W.3d 797, 810 (Tex. App.-Texarkana 2004, pet. denied). Mere requests or entreaties to execute a favorable instrument are not sufficient to establish subversion or overpowering of the maker's will, unless the entreaties are shown to be so excessive as to subvert the will of the maker. *Curry v. Curry,* 153 Tex. 421, 428, 270 S.W.2d 208, 212 (1954).

■ The pertinent evidence at trial was that Foster was hospitalized because of a broken hip and a heart attack. The evidence also showed that Foster was in pain and was on various medications, including pain medication. Turner visited Foster while she was in the hospital. Turner provided James Widener with information and instructions concerning the preparation of the deed and subsequently paid Widener. In addition, there was evidence of Foster's later will and of her statements to Hendon in 2004 indicating that she did not remember signing the deed and that she could not believe that Turner would have done such a thing.

Although this may constitute evidence from which an inference can be drawn that Turner had an opportunity to exert influence over Foster, it does not constitute evidence that Turner did subvert Foster's will or overpower her mind, thereby causing Foster to execute the deed. Because the evidence was legally insufficient to establish the elements of undue influence, we sustain Turner's second issue.

### D. Damages and Statute of Limitations

Because we have sustained Turner's issues regarding mental capacity and undue influence, we find it unnecessary to consider her third, fourth, and fifth issues, regarding actual and punitive damages and the statute of limitations.

### III. CONCLUSION

We reverse the judgment of the trial court and render judgment for Turner.