# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00007-CV

**Donald Harrell and Shirley Temesgen, Appellants**

**v.**

**Kris Hochderffer, as Trustee of the Clark Family Trust, Appellee**

### FROM PROBATE COURT NO. 1 OF TRAVIS COUNTY
### NO. 85,570-C, HONORABLE GUY S. HERMAN, JUDGE PRESIDING

## O P I N I O N

Appellants Donald Harrell and Shirley Temesgen appeal the trial court's denial of their motion for summary judgment and grant of partial summary judgment in favor of appellee Kris Hochderffer, in his capacity as trustee of the Clark Family Trust. The underlying dispute involves a personal-injury settlement received by the appellants' mother, Jessie Mae Clark, and stepfather, Rudie Clark, and a trust agreement entered into by Jessie Mae and Rudie.[1] Harrell and Temesgen sought a declaratory judgment that the proceeds Rudie received from the settlement and deposited into the trust represented community property. The trial court granted summary judgment in favor of Hochderffer, concluding that the settlement funds received by Rudie were separate property.

On appeal, Harrell and Temesgen contend that the trial court erred in issuing its order on summary judgment because as a matter of law, the settlement proceeds received by Rudie and

---

[1] To avoid confusion, we will refer to the Clarks by their first names.

deposited into the trust were the community property of Rudie and Jessie Mae. We affirm the trial court's order.

## BACKGROUND

In 1999, Rudie and Jessie Mae Clark brought a personal-injury suit against a nursing home where Rudie had received treatment after suffering a stroke in 1997. The suit was pursued by the couple's daughter, Deborah Clark, as "next friend" of the couple. In the petition, Rudie and Jessie Mae alleged that the nursing home was negligent in its treatment of Rudie and that the nursing home's negligence led to the amputation of both of Rudie's legs. Rudie and Jessie Mae sought damages for past and future mental anguish experienced by Rudie, past and future pain and suffering experienced by Rudie, past and future disfigurement and impairment, Rudie's past and future medical expenses, and exemplary damages. Jessie Mae brought a separate claim for loss of consortium.

The parties eventually settled the lawsuit and executed a settlement agreement in June 2002. In the settlement agreement, Rudie and Jessie Mae each agreed to dismiss the suit in exchange for a separate lump sum. Specifically, the agreement stated: "Plaintiff Rudie Clark hereby agrees to dismiss the Action, with prejudice . . . in consideration for the sum of $[redacted]. Plaintiff Jessie Mae Clark hereby agrees to dismiss the Action, with prejudice . . . in consideration of the sum of $[redacted]."[2] The agreement did not otherwise break down the settlement amounts according to

---

[2] The settlement amounts were redacted pursuant to an agreed protective order entered into by Deborah, Harrell, and Temesgen, in which they agreed that the personal-injury settlement amounts would remain confidential.

the types of damages requested in Rudie and Jessie Mae's petition. Deborah signed the settlement agreement on behalf of each of her parents. On July 9, 2002, the trial court appointed a guardian ad litem for Rudie and Jessie Mae. On July 18, the trial court issued an order approving the settlement agreement and dismissing the personal-injury suit.

On November 5, 2002, Rudie and Jessie Mae executed a trust document titled, "The Clark Family Trust." Hochderffer testified by affidavit that he was the trust manager of State Bank Trust and that State Bank Trust served as the trustee of the Clark Family Trust at the time the trust agreement was executed.[3] A document attached to the trust agreement, titled, "Schedule of Property," lists the couple's contributions to the trust and characterizes the contributions as separate property:

> Cash: $10.00 as the separate property of RUDIE CLARK and $10.00 as the separate property of JESSIE MAE CLARK.
>
> Settlement proceeds on behalf of RUDIE CLARK from the [personal-injury settlement] in the approximate amount of $[redacted], as the separate property of RUDIE CLARK.
>
> Settlement proceeds on behalf of JESSIE MAE CLARK from the [personal-injury settlement] in the approximate amount of $[redacted], as the separate property of JESSIE MAE CLARK.

Hochderffer testified by affidavit that shortly after the trust agreement was executed, Rudie and Jessie Mae's attorney delivered two checks to him that were to serve as Rudie and Jessie Mae's

---

[3] In April 2003, National Fiduciary Services purchased the assets of State Bank Trust and replaced State Bank Trust as trustee. A short time later, National Fiduciary Services resigned as trustee, and Hochderffer, in his individual capacity, became trustee.

initial contributions to the Clark Family Trust. Copies of the checks in the record show that the checks were made payable to State Bank Trust. One of the checks was made out in the amount of $11,476.11 and included a notation stating "on behalf of Jessie Clark" on the memo line, and the other was made out in an amount that has since been redacted and included a notation stating "on behalf of Rudie Clark" on the memo line.

The trust agreement provided that any community property of the spouses would retain its character as community property and that any separate property of the spouses would retain its character as separate property. According to the trust agreement, the trustee "shall presume that all property added to the trust by a Settlor is the separate property of that Settlor unless designated as community property in writing at the time such transfer is made." The trustee was also required to "keep separate, identifiable accounts for each Settlor's separate property" and "separate, identifiable accounts for any community property." The trust agreement further provided that upon the death of both spouses, the trust estate would be divided into two separate shares, one share for the estate of Rudie and one share for the estate of Jessie Mae. Rudie's share would consist of his separate property and his interest in any community property in the trust estate, while Jessie Mae's share would consist of her separate property and her interest in any community property in the trust estate. Rudie's share would be held and administered for the benefit of Deborah. Jessie Mae's share would be divided equally among Deborah, Harrell, and Temesgen.[4]

---

[4] While Deborah, Harrell, and Temesgen are all Jessie Mae's children, only Deborah is Rudie's biological child. Harrell and Temesgen are Jessie Mae's children from a previous marriage, and Rudie's step-children.

4

Rudie died in October 2003, and Jessie Mae died in April 2006. In October 2006, Harrell and Temesgen filed suit against Deborah, alleging tortious interference with inheritance. Later, Harrell and Temesgen added Hochderffer as a defendant and sought a declaratory judgment that the personal-injury settlement proceeds received by Rudie and contributed to the trust were community property. They also sought a full and complete accounting of the Clark Family Trust. All of the parties filed motions for summary judgment, and the trial court granted Deborah's motion in its entirety and Hochderffer's motion in part.[5] The trial court denied Harrell and Temesgen's motion for summary judgment. The trial court then severed its grant of Deborah's motion and partial grant of Hochderffer's motion from the rest of the cause so that the rulings could be appealed. Harrell and Temesgen now appeal the partial grant of Hochderffer's motion and the denial of their own motion.

### STANDARD OF REVIEW

Summary judgments are reviewed de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a motion for summary judgment, the movant must show that there is no issue of material fact and that it is entitled to judgment as a matter of law. *TX Far West, Ltd. v. Texas Invs. Mgmt., Inc.*, 127 S.W.3d 295, 301 (Tex. App.—Austin 2004, no pet.). Evidence favorable to the non-movant is taken as true and every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Id.*

---

[5] The trial court denied Hochderffer's motion with respect to the question of whether Hochderffer had provided a complete accounting of Jessie Mae's share of the trust.

When, as here, both parties move for summary judgment on the same issues, and the trial court grants one motion and denies the other, the appellate court considers the summary-judgment evidence presented by both sides, determines all questions presented, and if the reviewing court finds that the trial court erred, renders the judgment the trial court should have rendered. *Id.*

**DISCUSSION**

Harrell and Temesgen's arguments can be summarized in three issues on appeal. First, Harrell and Temesgen argue that the trial court erred in denying their motion for summary judgment and granting Hochderffer's motion because as a matter of law, the personal-injury settlement proceeds received by Rudie and subsequently contributed to the Clark Family Trust were community property, rather than separate property. Second, Harrell and Temesgen contend that Rudie and Jessie Mae never executed a valid partition agreement to convert the settlement proceeds from community property to separate property. Third, they argue that Rudie and Jesse Mae lacked the necessary mental capacity to execute the documents relied upon by Hochderffer to support his motion for summary judgment. We will address each of these contentions in turn.

*Character of the Settlement Proceeds*

In general, property possessed by either spouse during or on dissolution of marriage is presumed to be community property, absent clear and convincing evidence to the contrary. *See* Tex. Fam. Code Ann. § 3.003 (West 2006). Property owned or claimed by the spouse prior to the marriage is that spouse's separate property. *Id.* § 3.001(1) (West 2006). Of relevance to this appeal,

6

a spouse's separate property also includes "recovery for personal injuries sustained by the spouse during marriage, except for any loss of earning capacity during marriage." *Id.* § 3.001(3). In addition to the statutory exception for loss of earning capacity, courts have treated amounts recovered for medical expenses as community property. *See Graham v. Franco*, 488 S.W.2d 390, 396 (Tex. 1972) (characterizing amounts recovered for payment of medical expenses as community property because payment of such expenses "is the burden of the community"). Amounts recovered for disfigurement, past and future mental anguish, and past and future physical pain and suffering are considered separate property. *See Licata v. Licata*, 11 S.W.3d 269, 273 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

When a spouse receives a personal-injury settlement from a lawsuit during marriage, some of which could be separate property and some of which could be community property, it is that spouse's burden to demonstrate which portion of the settlement is his or her separate property. *Licata*, 11 S.W.3d at 273; *Kyles v. Kyles*, 832 S.W.2d 194, 198 (Tex. App.—Beaumont 1992, no pet.). Clear and convincing evidence showing the recovery is solely for the personal injury of a particular spouse is necessary to overcome the presumption that the settlement proceeds represent community property. *Licata*, 11 S.W.3d at 273.

In this case, Rudie and Jessie Mae received the personal-injury settlement proceeds during their marriage, triggering the general presumption that property possessed during marriage is community property. *See* Tex. Fam. Code Ann. § 3.003. The petition in the personal-injury suit sought past and future medical expenses, which would be classified as community property, as well as pain and suffering, mental anguish, and disfigurement, which would be classified as Rudie's

7

separate property. *See id.* § 3.001(3); *Graham*, 488 S.W.2d at 396; *Licata*, 11 S.W.3d at 273. The petition also sought damages for Jessie Mae's loss of consortium, which would be considered the separate property of Jessie Mae. *See Whittlesey v. Miller*, 572 S.W.2d 665, 669 (Tex. 1978). Because the settlement could potentially include amounts representing both separate and community property, Hochderffer bears the burden of overcoming the presumption that the entirety of the settlement proceeds are community property. *See Licata*, 11 S.W.3d at 273.

The settlement agreement itself does not specify the type of damages for which the settlement proceeds were paid. However, to rebut the community-property presumption, Hochderffer provided copies of the Clark Family Trust agreement, which included an attachment titled, "Schedule of Property." This Schedule of Property characterized Rudie's and Jessie Mae's individual portions of the settlement proceeds as separate property, to be contributed to the trust as their respective individual contributions. Specifically, the Schedule of Property stated:

> Cash: $10.00 as the separate property of RUDIE CLARK and $10.00 as the separate property of JESSIE MAE CLARK.
>
> Settlement proceeds on behalf of RUDIE CLARK from the [personal-injury settlement] in the approximate amount of $[redacted], as the separate property of RUDIE CLARK.
>
> Settlement proceeds on behalf of JESSIE MAE CLARK from the [personal-injury settlement] in the approximate amount of $[redacted], as the separate property of JESSIE MAE CLARK.

Hochderffer's summary-judgment evidence also included copies of two checks, made payable to the Clark Family Trust, that represented Rudie's and Jessie Mae's individual contributions to the trust. The amount of the check made on behalf of Rudie has been redacted, and the amount of the check

8

made on behalf of Jessie Mae was $11,476.11. The Schedule of Property demonstrates that both Rudie and Jessie Mae viewed their individual portions of the settlement proceeds as separate property, which in turn indicates that they had intended to settle the personal-injury suit to compensate for their own individual injuries, rather than any injury to the community. The checks and the Schedule of Property also establish the intention of Rudie and Jessie Mae that their individual contributions to the trust, the majority of which came from the personal-injury settlement, represented separate property.[6]

The intention of the spouses, shown by the circumstances surrounding the inception of title, is the major consideration in determining whether property is community or separate. *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.); *Scott v. Estate of Scott*, 973 S.W.2d 694, 695 (Tex. App.—El Paso 1998, no pet.). Inception of title occurs when the right to own or claim the property arises. *See* Tex. Fam. Code Ann. § 3.404(a) (West 2006). The execution of the Settlement of Property and the funding of the Clark Family Trust occurred less than four months after the personal-injury settlement was approved by the trial court, sufficiently proximate in time to be considered circumstances surrounding the inception of title.[7]

---

[6] The Clark Family Trust agreement also includes a provision stating that "the Trustee shall presume that all property added to the Trust by a Settlor is the separate property of the Settlor unless designated as community property in writing at the time such transfer is made." The record contains no written designation of any trust contribution as community property.

[7] The trial court's order approving the settlement and dismissing the personal-injury suit was dated July 18, 2002, and stated that the settlement amounts were to be paid to Rudie and Jessie Mae within seven days of the date of the order. There is nothing in the record to indicate the date that the settlement amounts were actually paid. The Clark Family Trust was created and funded on November 5, 2002.

Another circumstance surrounding the inception of title is the settlement agreement itself, which distinguishes between the spouses in describing the settlement amounts, rather than listing a single lump-sum to be paid to both Rudie and Jessie Mae. Specifically, the settlement agreement states: "Plaintiff Rudie Clark hereby agrees to dismiss the Action, with prejudice . . . in consideration for the sum of $[redacted]. Plaintiff Jessie Mae Clark hereby agrees to dismiss the Action, with prejudice . . . in consideration of the sum of $[redacted]." This language suggests that Jessie Mae's individual settlement amount represented damages for her loss of consortium, while Rudie's individual settlement amount represented damages for his claims of mental anguish, disfigurement, and pain and suffering.

The couple's intention to settle the personal-injury suit for amounts representing separate property, as indicated by the settlement agreement, the Schedule of Property, and the initial contributions to the trust, is consistent with the elements of damages sought in the personal-injury suit. Rudie and Jessie Mae did not seek damages for loss of Rudie's earning capacity, presumably due to the fact that at the time of his injury, Rudie was 88 years old and physically unable to work. The only element of damages sought in the personal-injury suit that may be characterized as community property would be Rudie's medical expenses, as medical expenses represent a community obligation. *See Graham*, 488 S.W.2d at 396. Hochderffer testified by affidavit that as trustee of the trusts created by the Clark Family Trust agreement, he repaid all sums owing to Medicaid and paid all of Rudie's medical expenses for the remainder of Rudie's lifetime from Rudie's separate trust. In light of Hochderffer's testimony that all of Rudie's medical expenses have been paid, no community obligation remains with respect to medical expenses. To the extent the

10

settlement amount might have included an award for Rudie's medical expenses, those funds would have been expended to repay Medicaid and cover the remainder of the medical expenses. *See Hill v. Hill*, 971 S.W.2d 153, 158 (Tex. App.—Amarillo 1998, no pet.) (describing presumption that when separate and community funds are commingled, separate funds "sink to the bottom" and community funds are withdrawn first); *see also Slaton v. Slaton*, 987 S.W.2d 180, 183 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (deducting amount of actual medical expenses from lump-sum settlement proceeds before determining proper characterization of remaining funds).[8]

The petition filed in the personal-injury lawsuit also sought exemplary damages. Harrell and Temesgen cite *Rosenbaum v. Texas Building & Mortgage Co.*, 167 S.W.2d 506, 508 (Tex. 1943), for the proposition that a recovery for exemplary damages is characterized as community property. In *Rosenbaum*, the supreme court noted that where one spouse sought exemplary damages in a suit for fraud, rescission of a contract, and cancellation of a note, "such damages, if recovered, would have belonged to the community." *Id.* This statement is not only dicta, but was made in the context of a contract dispute, rather than a claim for personal injuries.[9]

---

[8] We note also that in *Graham v. Franco*, the supreme court declined to express an opinion on whether personal-injury awards for medical expenses maintain their character as community property when the medical expenses were paid from the separate funds of the injured spouse. 488 S.W.2d 390, 396 n.5 (Tex. 1972). This leaves open the possibility that when an injured spouse has used separate property to fully satisfy the community obligation regarding medical expenses, a personal-injury award intended to govern medical expenses might be better classified as separate property.

[9] The court also observed that part of the relief sought was cancellation of a note executed by both spouses, so that "the suit in greater part was clearly for the benefit of the community." *Rosenbaum v. Texas Bldg. & Mortgage Co.*, 167 S.W.2d 506, 508 (Tex. 1943). In a personal-injury suit such as the one at issue here, where the injured spouse has suffered the amputation of his legs but lacked any remaining earning capacity, it cannot be said that "the suit in greater part was clearly for the benefit of the community."

11

A recovery for personal injuries, such as the one at issue here, is expressly characterized as separate property under the family code, with a statutory exception for any recovery for loss of earning capacity during the marriage. *See* Tex. Fam. Code Ann. § 3.001(3). The only additional exceptions acknowledged by Texas courts are funds recovered for "medical expenses incurred during marriage, and . . . other expenses associated with injury to the community estate." *Licata*, 11 S.W.3d at 273. Unlike lost earning capacity and medical expenses, however, exemplary damages do not represent income to which the community is entitled or an expense for which the community is liable. An exemplary damages recovery is merely "a private windfall," levied for the public purpose of punishment and deterrence, and is not associated with an injury to the community estate. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994). Because an exemplary-damages award does not fall under any exception to the general rule that the recovery for personal injuries is separate property, such damages must be characterized as separate property under family code section 3.001(3). *See* Tex. Fam. Code Ann. § 3.001(3). Thus, assuming without deciding that any of the settlement proceeds received by Rudie were meant to represent exemplary damages, such proceeds would have been characterized as his separate property. Likewise, any settlement proceeds received by Jessie Mae as exemplary damages in connection with her loss of consortium claim would have been characterized as her separate property.

In light of the foregoing, we hold that Hochderffer has provided clear and convincing evidence to overcome the presumption that the personal-injury settlement proceeds were community property and to establish their nature as separate property. *See Licata*, 11 S.W.3d at 273. Harrell and Temesgen relied solely on this presumption to support their claim that the settlement funds were

12

community property, presenting no additional evidence to suggest that the funds should be characterized as community property. We conclude that Hochderffer has defeated Harrell and Temesgen's claim for declaratory relief as a matter of law, and the trial court did not err in granting summary judgment in favor of Hochderffer. The appellants' first issue on appeal is overruled.

*Partition Agreement*

In their second issue, Harrell and Temesgen argue that neither the Clark Family Trust agreement nor the personal-injury settlement agreement constitutes a valid partition agreement. However, because we have already determined that the settlement proceeds were separate property, no partition agreement was necessary. *See* Tex. Fam. Code Ann. § 4.102 (West 2006) (allowing spouses to enter into partition agreement to convert community property into separate property). As a result, we need not address this issue.

*Mental Capacity*

In their third and final issue, Harrell and Temesgen argue that Rudie and Jessie Mae were mentally incapacitated at the time they executed the Clark Family Trust agreement and the accompanying Schedule of Property. Harrell and Temesgen did not raise this issue in their petition or motion for summary judgment, but raised it for the first time in their response to Hochderffer's motion for summary judgment. Because the Trust Agreement would be rendered unenforceable if the appellants prevail on their mental-incapacity claim, the claim is in the nature of an affirmative defense or a matter in avoidance. *See* Tex. R. Civ. P. 94. To defeat summary judgment by raising an affirmative defense, the non-movant must present summary-judgment evidence that raises a fact

13

issue on each element of the defense. *American Petrofina v. Allen*, 887 S.W.2d 829, 830 (Tex. 1994); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984).[10]

To establish mental capacity to execute a deed or contract, the grantors must have had sufficient mind and memory at the time of execution to understand the nature and effect of their act. *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.); *Jackson v. Henninger*, 482 S.W.2d 323, 325 (Tex. Civ. App.—Austin 1972, no writ). The proper inquiry is the condition of the grantors' minds on the day the deed or contract was executed, and any evidence from before or after the date of execution must be near enough in time to be probative of the grantors' mental capacity on the execution date. *See Turner v. Hendon*, 269 S.W.3d 243, 252 (Tex. App.—El Paso 2008, pet. denied); *Dubree v. Blackwell*, 67 S.W.3d 286, 290 (Tex. App.—Amarillo 2001, no pet.); *Bradshaw v. Naumann*, 528 S.W.2d 869, 875 (Tex. Civ. App.—Austin 1975, writ dism'd) ("The proper inquiry is the condition of the grantor's mind on the day the deed was executed and not whether she was . . . of unsound mind at another time prior to or after the making of the deed.").

To support their claim that Rudie was mentally incapacitated at the time the Clark Family Trust agreement was executed, Harrell and Temesgen point to the agreement's signature page, which shows that Rudie signed the agreement with what appears to be a "G" next to an

---

[10] Even if we did not characterize this claim as an affirmative defense or matter in avoidance, Harrell and Temesgen would still bear the burden of raising a fact issue on mental capacity, as the burden of proof rests on those seeking to set aside a deed or contract to show lack of mental capacity of the grantor at the time of execution. *See Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.); *Jackson v. Henninger*, 482 S.W.2d 323, 324-25 (Tex. Civ. App.—Austin 1972, no writ); *see also Estate of Galland v. Rosenberg*, 630 S.W.2d 294, 297 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.).

unintelligible mark, despite the fact that Rudie had no "G" in his name. While circumstantial evidence may be offered to raise an issue of material fact, such evidence must transcend mere suspicion. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). Evidence that is so slight as to make any inference a guess is in legal effect no evidence. *Id.* Here, an inference of mental incapacity does not rise above a mere suspicion, as Rudie's difficulty in signing his name may be explained by physical disability just as easily as mental incapacity. In either case, the inference would be a mere guess or suspicion. In addition, Harrell and Temesgen represent in their amended petition that Rudie was unable to read or write. Thus, Rudie's use of the letter "G" and an unintelligible mark as his signature might also be explained by his inability to read and write.[11] Under the circumstances, Rudie's signature fails to raise an issue of material fact with respect to his mental capacity. *See id.*; *Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex. 1984) ("When circumstances are consistent with either of . . . two facts and nothing shows that one is more probable than the other, neither fact can be inferred.").

Harrell and Temesgen also point to evidence from before and after the date of execution of the trust agreement as evidence that Rudie and Jessie Mae were mentally incapacitated on the date of execution. Four months prior to the date of execution, the trial court appointed a guardian ad litem for Rudie and Jessie Mae in their personal-injury suit. However, the appellants have not cited, and we have not found, any authority for the proposition that the appointment of a

---

[11] The record contains an affidavit in which Rudie and Jessie Mae's estate-planning attorney avers that he read and explained the trust agreement to Rudie and Jessie Mae on the date of execution. This affidavit indicates that despite Rudie's apparent inability to read the trust agreement, he was aware of its contents. The affidavit further states, "I witnessed [Rudie] place his mark on the trust document, and [Jessie Mae] signed it herself."

15

guardian ad litem establishes that a party is mentally incapacitated. Like Rudie's signature, the evidence could just as easily indicate that Rudie and Jessie Mae were physically incapacitated, making any inference of mental incapacity a mere guess.[12] Thus, the appointment of a guardian ad litem in the personal-injury suit is in legal effect no evidence of mental incapacity. *See Ridgway*, 135 S.W.3d at 601; *Gammage*, 668 S.W.2d at 324.

The remaining evidence offered by Harrell and Temesgen to support their claim of mental incapacity includes: (1) a doctor's report indicating that in 1997, five years prior to the execution of the trust agreement, Rudie was incapable of repositioning himself due to his physical and mental capabilities after suffering a stroke; (2) documents showing that Deborah filed the personal-injury suit as Rudie and Jessie Mae's "next friend" in 1999, three years prior to the execution of the trust agreement; (3) a February 2004 application for appointment of a guardian for Jessie Mae, filed more than a year after the execution of the trust agreement, stating that Jessie Mae was "totally incapacitated" and suffered from Alzheimer's disease; and (4) a May 2005 letter from Jessie Mae's physician to the trial court, dated more than two years after the execution of the trust agreement, stating that Jessie Mae "require[d] constant supervision due to her dementia." Evidence from years before and more than a year after the execution of the trust agreement, without evidence showing that the same condition existed at the time of the execution of the trust agreement, is not probative of the mental capacity of Rudie and Jessie Mae to execute the trust agreement. *See Turner*, 269 S.W.3d at 252; *Dubree*, 67 S.W.3d at 289; *Bradshaw*, 528 S.W.2d at 875.

---

[12] There is nothing in the record to indicate the reason a guardian ad litem was appointed in the personal-injury suit.

16

Because there is no evidence to establish that either Rudie or Jessie Mae was mentally incapacitated on the date they executed the trust agreement or the accompanying Schedule of Property, Harrell and Temesgen have failed to raise an issue of material fact as to Rudie's and Jessie Mae's mental capacities on that date. *See Ridgway*, 135 S.W.3d at 601; *Gammage*, 668 S.W.2d at 324. We overrule their third issue on appeal.

## CONCLUSION

We affirm the trial court's order granting partial summary judgment in favor of Hochderffer and denying the motion for summary judgment filed by Harrell and Temesgen.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson;
  Dissenting opinion by Justice Puryear

Affirmed

Filed:  June 10, 2011